August J.C. EGLE, Plaintiff-Appellee,

v.

Ann E. Schraedel EGLE,
Defendant-Appellant.

No. 82–3037.

United States Court of Appeals,
Fifth Circuit.

Sept. 30, 1983.

Flaxman & Flaxman, Charles Flaxman, Neil Flaxman, Coral Gables, Fla., for defendant-appellant.

Edward C. Vining, Jr., Miami, Fla., Albert J. Joyce, Jr., Balboa, Republic of Panama, Benjamin A. Neil, Baltimore, Md., for plaintiff-appellee.

Howard S. Scher, Dept. of Justice, Civ. Div., Washington, D.C., for amicus curiae U.S.A.

Before WILLIAMS and JOLLY, Circuit Judges, and WILL *, District Judge.

WILL, District Judge:

This is an appeal from an order which modified a divorce decree respecting the custody of the parties' minor children, the amount of alimony and child support, and distribution of certain property. Both the divorce decree and the order modifying it were entered by the former United States District Court for the District of the Canal Zone, a court which ceased to exist as of April 1, 1982, pursuant to Article XI of the Panama Canal Treaty.

* District Judge of the Northern District of Illinois, sitting by designation.

1. Appellee's brief was filed on March 29, 1982, and the appeal was then transmitted to the

An earlier panel of this circuit considered the merits of the appeal from the modification order, but did so without the benefit of oral argument and in an expedited fashion in light of the possibility that appellate jurisdiction might, like the district court itself, expire on April 1, 1982.[1] In an unpublished opinion, that panel affirmed the modification order on its merits, with one judge dissenting. *See Egle v. Egle,* 673 F.2d 1326 (5th Cir.1982) (noting only affirmance). A timely petition for rehearing was filed and granted, 679 F.2d 380 (5th Cir.1982), and further briefing was requested regarding this court's post-March 31, 1982 appellate jurisdiction of decisions of the former district court. Upon rehearing, the panel which had affirmed the modification vacated that affirmance, and transferred the case to the circuit's oral argument calendar. *Egle v. Egle,* 690 F.2d 446 (5th Cir.1982) (per curiam). Having had the benefit of briefing and oral argument on both the merits and the jurisdictional questions, we now conclude that we have jurisdiction to review the modification order, and we affirm that order in part and vacate it in part.

I. Factual Background and Proceedings in the District Court

Ordinarily, review of a modification of a divorce decree focuses upon events occurring after entry of that decree. *See generally* Part III, *infra,* of this opinion. However, the parties' arguments as to the propriety of the modification ordered by the district court require familiarity with fairly extensive background information.

August Egle and Ann Egle were married on September 3, 1960, in Miami, Florida. They have two children, Erik and Anders, born on December 2, 1969, and on November 3, 1974, respectively. Although they maintained a home and other property in Glen Burnie, Maryland (Mr. Egle's hometown), their marital domicile at the time of their separation on August 5, 1979, was the

previous panel "at the eleventh hour of the Canal Zone District Court's existence." *Egle v. Egle,* 673 F.2d 1326 (5th Cir.1982).

former Canal Zone, where Mr. Egle worked as a ship pilot on transits through the canal.

The record reflects that the parties and their children were at various times in 1979, in the former Canal Zone, Maryland, or Miami, the general pattern being one of Mr. Egle's attempting with some difficulty to locate and catch up with his wife and children. For example, on one occasion he telephoned his children in Maryland from the Canal Zone, and stated that he would be in Maryland the next day. Upon arrival at their Maryland home, he found only a letter, from his wife's attorney, informing him that Mrs. Egle was considering a divorce, but no information as to the whereabouts of Mrs. Egle or the children. He returned to the Canal Zone, where he learned through the vicar of his church that Mrs. Egle planned to return to the Canal Zone on August 13. On that date he filed an action for divorce in the former United States District Court for the District of the Canal Zone,[2] and served her with process.

Following the commencement of divorce proceedings in the Canal Zone, Mrs. Egle returned to Miami with one of the children. The chase of the previous months resumed, as her husband boarded the same flight to Miami, but she refused to tell him her precise destination, and upon arrival told him not to follow her. Through his own efforts he located her several weeks later. On November 6, 1979, Mrs. Egle obtained an *ex parte* restraining order against her husband from a Florida court. She later served him with an amended petition seeking separate maintenance. When he appeared, the restraining order was lifted, and he was allowed visitation rights. However, as Judge Pittman later found, Mr. Egle met with considerable resistance in attempting to exercise those rights.

Meanwhile the Canal Zone divorce action proceeded. During the last several years of the district court's existence, that court was staffed by visiting judges (generally district judges from within the old Fifth Circuit) designated by the Chief Judge of the Circuit.)[3] The privilege or onus of presiding over the *Egle* case was shared by several judges, but was born predominantly by Judges Virgil Pittman and Frank McFadden.

On January 11, 1980, Judge McFadden held a hearing on Mr. Egle's motion for custody of both children *pendente lite,* and entered an order dated January 12, 1980, awarding such custody to Mrs. Egle. That order was conditioned upon her moving back to the Canal Zone and residing in suitable quarters, to be provided by her husband, and upon the granting of "reasonable visitation rights" to Mr. Egle. Although Judge McFadden urged the parties to agree on the specifics of visitation, he set the parameters of visitation rights as at least once per week with Mr. Egle's having the right to temporary custody for a 24-hour period at least once every two weeks in addition to weekly visitation.

Judge McFadden's comments at the *pendente lite* custody hearing state a theme which recurs frequently in this record and which indicates the frustration which results when the standard (governing custody decisions) of what is in the children's best interest might easily be restated as which choice presents the lesser of two evils:

If it was within the Court's power, the Court would remove the child from the custody of both parents until this matter is resolved The child—or rather the children, particularly the older one, are

**2.** The United States District Court for the District of the Canal Zone was a court of general jurisdiction. *See* Canal Zone Code tit. 3, §§ 1 and 141, printed in 76A Stat. at 51 and 56. The district court was specifically given jurisdiction over actions for divorce. C.Z.Code tit. 8, § 191, 76A Stat. at 681.

**3.** *See* Pub.L. 96–70, § 1515; 1979 U.S.Code Cong. & Adm.News 1034, at 1082. From July

1, 1979 through March 31, 1982, Judge Morey Sear of the Eastern District of Louisiana acted as Chief Judge of the District of the Canal Zone, for purposes of administration during the transitional period. However, the judicial functions of the former district court continued to be performed by various judges on a rotating basis.

caught in the crossfire between competing and apparently vengeful parents.

\* \* \* \* \* \*

[I]t is in all probability that I shall never see either of you again. I am impressed by the fact that you are using your child as a pawn, as an instrument in your own personal fight; and I suggest to you that that is a grievous injury to impose upon the child you brought into the world.

Judge McFadden also ordered that if Mrs. Egle elected to remain in Miami rather than move back to the Canal Zone *pendente lite* her husband would have temporary custody of the elder child, and she would have temporary custody of the younger child, the decision regarding future custody of both children to be made following a further hearing and entry of an interlocutory divorce decree.

Mrs. Egle returned to the Canal Zone per Judge McFadden's order. A further hearing on the various issues pertinent to the Egles' divorce action was held on June 16–18, 1980, before Judge Pittman.

In his opinion and order of July 18, 1980, Judge Pittman noted that if Mrs. Egle was awarded custody she planned to move back to Miami, and that her husband, if awarded custody, planned to continue to live and work in the Canal Zone. Judge Pittman observed that Mr. Egle's work as a ship's pilot "requires him to be away from home from twelve to fifteen hours on each transit through the Canal. His duty hours may be in either the daytime or nighttime and follow no regular pattern."

In his findings of fact, Judge Pittman also determined that Mrs. Egle had been extremely upset emotionally for "a period of two or three years" prior to the Egles' separation, had become estranged from her husband while focusing her love and affection upon their children, and that her estrangement from her husband "together with her abandonment of him and the hiding of the children, constitutes extreme cruelty which entitles him to a divorce."

Judge Pittman characterized Mrs. Egle's post-separation conduct with respect to her husband's right to maintain a parental relationship with his children as "unreasonable and unfair," stating that "[s]he seems to feel that because she is a mother, her rights are superior to those of the father." Judge Pittman also found that

from the time of the separation to this date, the wife has persistently and unreasonably interfered with the visitation rights of the husband. She has sought excuses and has sought to evade the expressed provision of this court's order, both as to where she lived while she was here and the overnight visits of the children with the father and has generally been uncooperative. At one time she unilaterally sought to inform the husband that unless he signed a medical benefit card, she would deny him the visitation privileges. She had no right to use the children's custody in such a manner. She could have sought relief from the court.

In addition, Judge Pittman found that Mrs. Egle had tried to "impregnat[e] the children's minds against their father," and that she and the elder child, Erik (then ten years old), had made "lurid and unbelievable charges concerning the conduct of the father" which had not been established by a preponderance of the evidence.

Notwithstanding Mrs. Egle's conduct, Judge Pittman awarded the custody of the two children to her, based upon the "totality of the circumstances":

The court finds that the father is a suitable person for the custody of the children. The court finds that the wife has been a good mother and continues to be a good mother except the court is seriously concerned over the impregnation of a dislike for the father in the minds of the children by her.

\* \* \* \* \* \*

The wife is awarded custody of the two minor children subject to visitation rights for the father as to be hereinafter set out. The court again specifically notes that the wife has been unreasonable in [not] permitting the husband to exercise his visitation privileges. The wife is warned and cautioned about her conduct in the future concerning visitation rights and against her wrongfully and unfairly

by act and speech, impregnating the children's minds against their father.

The award of the custody is made to the wife and mother because of the totality of the circumstances. The court considers this to be in the best interest of the children at this time. The court again states that it believes the husband and father to be a good and competent custodian, but his long hours of work and the irregularity of his schedule would make it difficult for him to provide the continuous care children of this age need. Except for the wife's relationship with the husband, her care of the children has been good.

Judge Pittman also ordered Mr. Egle to pay Mrs. Egle $500.00 every two weeks "as alimony and support of the minor children." The July 18 order also divided certain assets and liabilities between Mr. and Mrs. Egle, and set up a procedure by which other property (household goods such as furniture and silverware, located variously in Maryland, Miami, or the Canal Zone) would be inventoried and divided between them. The only property distribution that is significant for this appeal is Judge Pittman's decision that Mr. Egle pay Mrs. Egle $10,-000.00 within one year of the date of the decree in return for her interest in their Maryland home. Judge Pittman found that "[a]t the time the parties were married, the husband brought into the marriage one-half

interest in the Maryland home...." Judge Pittman did not, however, make a finding as to the 1980 value of the Maryland home.

On August 15, 1980, Judge Pittman entered his "Supplemental Findings of Fact and Conclusions of Law." For purposes of this appeal that supplemental order contains two significant decisions. First, Judge Pittman revoked his earlier decision that Mrs. Egle convey her interest in the couple's Maryland home to Mr. Egle in return for $10,000.00, concluding that provisions in the Canal Zone Code for distribution of community property upon divorce applied only to personal property and not to real property located outside of the Canal Zone.[4] Judge Pittman therefore concluded that unless the parties agreed to the court's prior distribution of interests in the Egles' Maryland home within 45 days of the filing of the supplemental findings, the laws of the State of Maryland would govern their respective interests in property located in that state.

Second, Judge Pittman's supplemental order of August 15, 1980, specified Mr. Egle's visitation rights. Pursuant to the supplemental order, Mr. Egle was entitled to custody of both children for a two month period each summer, and to custody for any weekend upon written notice at least one week in advance of any designated weekend. The supplemental order also provided for custody during the Thanksgiving and

---

4. The provisions in question were sections 278 and 280 of Title 8 of the Canal Zone Code. Section 278 reads as follows:

§ 278. Separate property generally

The following property, with the rents, issues and profits thereof, is the separate property of a spouse;

(1) property owned by the spouse before marriage; and

(2) property acquired by the spouse after marriage by gift, bequest, devise or descent. The wife may convey her separate property without the consent of her husband.

76A Stat. at 686. Section 280 states as follows:

§ 280. Community property; presumptions

(a) Except as provided by sections 278 and 279 of this title, personal property, wherever situated, acquired after marriage by either husband or wife, or both, while residing in the Canal Zone, is community property; but whenever personal property, or an interest therein or encumbrance thereon, is acquired

by a married woman by an instrument in writing, the presumption is that it is her separate property, and if acquired by her and another person, the presumption is that she takes the part acquired by her, as an interest in common, unless a different intention is expressed in the instrument; except that when personal property is acquired by husband and wife, unless a different intention is expressed in the instrument, the presumption is that the property is the community property of the husband and wife.

(b) The presumptions provided for by subsection (a) of this section are conclusive in favor of a person dealing in good faith and for a valuable consideration with the married woman or her legal representatives or successors in interest and regardless of a change in her marital status after acquisition of the property.

76A Stat. at 686.

Christmas holidays, one parent to have custody for one holiday and the other parent to have custody for the other holiday, the parents to exchange custodial holidays from year to year.

Finally, on October 8, 1980, Judge Pittman amended his order of July 18, 1980, *nunc pro tunc,* to reflect that the July 18 order was an interlocutory decree of divorce, rather than a final decree. Judge Pittman's order to October 8, provided in accordance with sections 198(a) and (b) of Title 8 of the Canal Zone Code[5] that

> when six (6) months from the date of entry hereof shall have elapsed and the parties hereto are both alive and unreconciled the one with the other and there is no appeal or motion to set aside pending and undetermined, the plaintiff, AUGUST J.C. EGLE, upon application and Final Decree of Divorce submitted, shall be entitled to a Final Decree of Divorce cancelling and dissolving the bonds of matrimony binding the plaintiff to the defendant and, thus, restoring them, AND EACH OF THEM, to the status of single, unmarried persons.
>
> THIS IS AN INTERLOCUTORY DECREE AND NO DIVORCE IS GRANTED HEREBY.

[Emphasis in original.]

On September 23, 1980, Mr. Egle had moved for modification of Judge Pittman's order (of July 18, 1980, as supplemented by the August 15 order) respecting the specifics of his visitation rights and other matters not pertinent here. Judge Pittman summarily denied that motion on October 8, 1980.

On October 30, 1980, Mr. Egle filed a second motion for modification of visitation rights, essentially a motion for reconsideration of the denial of the earlier motion. He alleged that a change of circumstances (since the hearing in June of 1980) had occurred, and requested a hearing on whether visitation rights should be expanded in light of the change in his work schedule to a "Pilot's 6–4 Work Plan," *i.e.,* periods of six weeks of work alternating with periods of four weeks paid vacation, thereby allowing him to spend approximately four weeks in Miami (where Mrs. Egle had moved with their children) out of every ten weeks. Following briefing of the motions to modify the decree, Judge Pittman, on May 12, 1981, vacated his denial of the motion filed on September 23, 1980, and scheduled a hearing for June 15, 1981.

Meanwhile, Mrs. Egle had begun collateral proceedings in the Circuit Court of Dade County (Florida) "for [e]nforcement and [m]odification of [j]udgment and ... for [d]eclaration of [r]ights." She sought, among other things, an increase in the amount of alimony and child support, alleging that her expenses had increased and that Mr. Egle's income had doubled since the date of the interlocutory decree. In support of her position that any hearing be held in the Florida courts in Miami, she argued that no *final* divorce decree had been timely sought or entered in the Canal Zone and that the Canal Zone district court

---

**5.** Section 198 of Title 8 of the Canal Zone Code states as follows:

> **§ 198. Interlocutory order; appeal; final decree of divorce**
>
> (a) A final decree granting a divorce may not be entered until after the expiration of a period of six months from the date of the entry of an interlocutory order adjudging that a case for divorce has been proved. The interlocutory order shall expressly state that a divorce is not granted by it. An appeal may be taken from the order in the same manner and within the same time as an appeal from a final decree of the court in any other proceeding.
>
> (b) After the expiration of the period of six months provided by subsection (a) of this

section, or, if an appeal is taken and the case is pending at the time of the expiration of the period, after the final disposition of the case if determined in favor of the plaintiff, the court, upon application filed within 30 days after the expiration of the period or the final disposition, by the person in whose favor the interlocutory order was entered, shall enter a final decree granting a divorce. If an application is not made, the court may, on its own motion, within three months after the expiration of the 30-day period, enter a final decree of divorce. An appeal may not be taken from the final decree.

76A Stat. at 683.

had lost its jurisdiction to enter such an order *nunc pro tunc.*

Mr. Egle, had however, filed on April 9, 1981, an application for a final decree of divorce. Contrary to Mrs. Egle's later jurisdictional objection, the application for entry of a final decree was not yet ripe for filing because the pending motion for reconsideration of the denial of the motion to modify the interlocutory decree was essentially a motion to set aside portions of that decree. Section 198 and Judge Pittman's order of October 18, 1980, made such an application inappropriate until thirty days after resolution of the motion to modify.[6] On June 19, 1981, Judge McFadden entered a final decree of divorce, *nunc pro tunc* to May 8, 1981.

Shortly thereafter, on June 22, 1981, Judge McFadden held in abeyance the pending motions (and the rescheduled hearing) pending appointment of a guardian ad litem for the minor children. On July 10, 1981, he appointed Ms. Brenda Abrams, an attorney from the Miami area specializing in family law, as the guardian, finding that "the parents in this case . . . are using the minor children as foils and . . . care for the children is at best a secondary motive." Judge McFadden, on July 16, 1981, ordered Mrs. Egle to dismiss the action that she had filed in the Circuit Court in and for Dade County. She did not do so until September 14, 1981, following her former husband's filing of a petition for sanctions, although the Dade County court had abated her action on August 4, 1980, upon a motion filed by Mr. Egle.

On September 15, 1981, Mr. Egle amended his motion to modify the decree of July 18, 1980, to request (rather than an expansion of visitation rights) that primary custody of the children be taken from his former

wife and given to him, alleging that the "totality of the circumstances" had changed such that primary custody with Mr. Egle had become in the children's best interests. The bases for the requested change of custody were, according to Mr. Egle, his former wife's consistent interference with and frustration of the exercise of his visitation rights, as manifested in particular by the circumstances surrounding her change of residence from Miami to Palm Coast, Florida, continued attempts to turn the children against him, and her violation of the court's warning and order.

The parties stipulated to holding the hearing on all motions[7] to modify the provisions of Judge Pittman's decree in Miami on September 24 and 25, 1981, with Judge McFadden sitting as the district court for the district of the Canal Zone.

In Miami, Mrs. Egle and the children lived with Mrs. Egle's mother, in the grandmother's apartment building.[8] On August 25, 1981, she and the children moved to a house in Palm Coast, Florida, located approximately 285 miles north of Miami and 25 miles north of Daytona Beach. No advance notice of the move was given either to Mr. Egle or to the guardian. By a letter dated September 5, 1981, and postmarked September 8, 1981, Mrs. Egle informed her former husband of the move. In this letter she did not give her new address, but listed a post office box and her telephone number. She also indicated in the letter that she would be willing to take the children to the Daytona airport to meet their father.

At the hearing, Mr. Egle testified that after learning of the move, he attempted to discover what schools the children were attending. Upon identifying the only school which his elder son could be attending, he

---

**6.** Alternatively, the application was timely. Section 198 and Judge Pittman's order of October 8, 1980, provided only that a final decree could be obtained *after* six months had elapsed from July 18, 1980, not that the application had to be filed *within* a particular period of time.

**7.** Other motions to modify the interlocutory decree dealt with disputes over procedures established for division of the Egles' personal property, and are not pertinent here.

**8.** The record is not entirely clear as to whether the grandmother owned the building or was a tenant in the building. It appears from the record that Mrs. Egle and the children did not occupy part of the grandmother's unit but instead occupied a unit across the hall from the grandmother's unit.

called the principal. According to Mr. Egle, the principal refused to give him any information about his son, telling him that his refusal was based on the child's mother's orders. However, at no time between receipt of his former wife's letter and the date of the hearing did Mr. Egle call the telephone number provided in the letter.

Mr. Egle also testified to encountering difficulty in exercising his visitation rights when Mrs. Egle and the children resided in Miami. Specifically, Mr. Egle testified that on a visit during June or July of 1981, Mrs. Egle's brother told him not to come onto their property anymore. According to Mr. Egle, his former brother-in-law grabbed a steel chair while both men were in the foyer of the building, raised the chair over his own head, and threatened, "I'm going to kill you, you sonofabitch." The former brother-in-law thereupon followed Mr. Egle out into the street.[9]

Mr. Egle also testified to his impression that his former wife was trying to alienate their sons from him. He did not give any examples of statements about him made by Mrs. Egle in the presence of their children, stating only that such criticism was "indirect" and "subtle," and in the nature of innuendo. He testified further that his sons, particularly the elder one, were aloof and outwardly hostile to him when in the presence of both parents. According to Mr. Egle, he never received telephone calls or letters in Panama from his sons when they were in Miami, though he enclosed stamps and envelopes in his letters to them and encouraged them to call and write to their mother when they stayed with him in Panama.

The guardian corroborated Mr. Egle's testimony concerning Mrs. Egle's conduct in connection with the move to Palm Coast, her attitude toward her former husband, and how that attitude affected her treatment of her former husband's rights to visit and maintain contact with their children. The guardian testified that she was not aware of any plans by Mrs. Egle to move

from Miami until Mrs. Egle telephoned her on September 3, 1981, and said that she had moved to Palm Coast on August 25. Mrs. Egle at first gave the guardian her postal box number and telephone number, and informed the guardian of her new street address when the guardian asked for it. Upon learning that Mr. Egle had not been told of the move, the guardian urged Mrs. Egle to send him the new address and telephone number. According to the guardian, Mrs. Egle agreed to send the Post Office box number and telephone number, but was adamant about not wanting to tell her former husband her new street address.

The guardian also testified that Mrs. Egle was hostile toward her former husband, and communicated this hostility by innuendo and "indirect criticism" to their children. According to the guardian, Mrs. Egle had told her that she had explained to her sons that Mr. Egle would always be their natural father unless he died or they were adopted by another party. In the guardian's opinion, Mrs. Egle had not in any way encouraged contact between the children and their father but rather had created an atmosphere which minimized such contact.

The guardian corroborated Mr. Egle's testimony that the move from Miami to Palm Coast would greatly inconvenience him in the exercise of visitation rights. The guardian was also of the opinion that Mrs. Egle's earlier conduct had "restricted visitation to the absolute minimum.... [E]ach and every one of her actions is consistent with the view that she would like the children to see as little of Captain Egle as possible."

In the guardian's opinion, the elder child was very close to his mother, and had in the past been hostile toward his father, though that relationship had improved during the summer weeks that the children had spent with their father. She was also of the opinion that the younger child had good relationships with each parent, and that the

---

**9.** It appears from the transcript that all of these manifestations of belligerence occurred on one occasion, though there is no indication as to whether the children witnessed any of these scenes.

two boys had a good relationship with each other.

The guardian concluded that Mrs. Egle was "a very good mother with a major exception, of her relationship with the children in regard to their father." The guardian also concluded that Mr. Egle was "a fine person and a fine father." She was of the opinion, however, that custody of both children should remain with Mrs. Egle because the elder child clearly did not want to reside with his father and would be likely to be hostile toward him if forced to live with him. In her opinion, a good relationship between Mr. Egle and the elder son would have to be developed gradually. She advised against keeping the children apart, and concluded that frequent visits by Mr. Egle would be sufficient to counteract Mrs. Egle's influence upon the children and to enable him to maintain rapport with his sons.

Mrs. Egle testified that she had moved to Palm Coast because she believed it to be a better place than Miami to raise children. While she could afford to rent a house (rather than an apartment) in Palm Coast, equivalent housing in Miami was beyond her means.

She testified that she had tried to accommodate her former husband in the exercise of visitation rights, by agreeing to last-minute changes in schedules and by allowing for the difficulties that he encountered from time to time with taxis and rented cars. She denied saying bad things about him to their children or otherwise attempting to influence their attitude toward him, and stated that she had encouraged the children to show affection for their father and to write to him.

In contrast to the guardian's testimony, Mrs. Egle testified that she "believed" that she had told the guardian, on July 17, 1981, that she was thinking of leaving the Miami area, but did not tell her where she would go because she had not yet decided on an area. She could not explain, however, why she did not also inform her former husband of what she was contemplating.

Mrs. Egle stated that she had fears about Mr. Egle's knowing where she lived and she had told the guardian of her fears. At first, she was not able to explain the basis for her fears,[10] then cited an incident in July of 1981 when Mr. Egle had arrived for visitation with a police escort.[11]

During the hearing, Judge McFadden found Mrs. Egle in contempt of court for her failure to dismiss her Dade County lawsuit expeditiously. Judge McFadden did not impose any fine upon her or sentence her to any period of incarceration, and stated that his finding that Mrs. Egle had been in contempt of court would not determine his decision regarding Mr. Egle's motion for a change of custody.[12]

In an opinion dated December 15, 1981, Judge McFadden modified the decree so as to award custody of the children to their father. Judge McFadden noted Judge Pittman's concerns about Mrs. Egle's attempts to instill in her children an extreme dislike for their father, and Judge Pittman's warning to her about her future conduct concerning visitation rights. Judge McFadden added:

> She has not heeded the warning. She has moved the children without letting the father know their whereabouts. She ignored the proceedings in this court and started a separate proceeding in Florida

---

**10.** In an earlier hearing, however, Mrs. Egle accused Mr. Egle of having attempted to run her over with his automobile.

**11.** His request for a police escort occurred following his alleged receipt of an anonymous death threat via a telephone call at his hotel in Miami, when, to his knowledge, the only people who knew where he was staying were Mrs. Egle and her relatives.

**12.** Although Mrs. Egle did not appeal from Judge McFadden's finding that she had been in

contempt of court for her dilatory dismissal of her Dade County lawsuit, she argues that he took custody of the children from her to punish her for her violation of court orders. She now states that following the abatement of her Dade County lawsuit, her Florida counsel informed her Canal Zone counsel of the abatement and "requested ... Panamanian counsel to so advise the judge [*i.e.,* Judge McFadden] in the hopes that the judge would reconsider his order requiring the Wife to dismiss the State Court action." Appellant's Brief at 32.

which could only have been designed to harass and whipsaw her former husband. She ignored instructions and orders of this court to dismiss the Florida case. It was finally dismissed when she faced a contempt proceeding in this court.

\* \* \* \* \* \*

It has been clearly demonstrated that the defendant will do everything in her power to frustrate her former husband's rights with respect to his children and that her interest is not for the welfare of the children but to retaliate against him. It is my further judgment that she will continue to do so.

\* \* \* \* \* \*

The court is concerned about the provisions to be made for the children's care while their father is away on his job. The court is of the opinion, however, if the matter is ever to be brought to rest and some stability brought into the life of the children it can only be if the father has their custody. The court reiterates Judge Pittman's finding that the father is a fit custodian. It is also the court's opinion that the disruption to the children is outweighed by the necessity for a change in custody. It is the opinion of the court that the father has the right to work where he wishes and to assume the responsibility for the care of his children. It will be his duty to work out the details of their care and his job.

In conjunction with this change of custody from Mrs. Egle to Mr. Egle, Judge McFadden gave Mrs. Egle essentially the same visitation rights that had previously been held by Mr. Egle. Judge McFadden also rescinded provisions for Mr. Egle's payment of child support, except that he ordered Mr. Egle to pay $500.00 every two weeks during the summer when the children are with their mother. Judge McFadden also ordered Mr. Egle to pay alimony of $250.00 every two weeks until January 1, 1983.

Additionally, Judge McFadden reinstated Judge Pittman's earlier order that Mr. Egle give Mrs. Egle $10,000.00 in return for her conveyance to him of her interest in their home in Maryland. Finally, Judge McFadden denied Mrs. Egle's application for attorneys' fees, stating that "[m]ost of the legal work was caused by defendant's own attempts to modify the decree and to defend against [sic] her own unwarranted conduct and should not be paid by the plaintiff."

Mrs. Egle appealed from the order changing primary custody from her to her former husband, from the reduction of Mr. Egle's obligation to pay alimony and child support, from the order mandating conveyance to her former husband of her interest in their Maryland home, and from the denial of her application for attorneys' fees. The parties stated during oral argument that Mrs. Egle had remarried during the interim, and had withdrawn her appeal from Judge McFadden's limitation upon Mr. Egle's payment of alimony. Interestingly, as was also disclosed during oral argument, her new husband also works in the former Canal Zone as a ship pilot. Mrs. Egle (the name which we will continue to call her for purposes of this opinion) still resides in Palm Coast, Florida, though evidently divides her time between Florida and Panama.

II. The Jurisdictional Questions

The statutory basis for our appellate jurisdiction of this case, 28 U.S.C. §§ 41 and 1291, continues to give this circuit jurisdiction of appeals from final decisions of the Canal Zone district court, notwithstanding amendments to those statutes effective April 2, 1982, the day following expiration of the transitional period provided by the Panama Canal Treaty and the abolition of the district court itself.[13] In its current form, 28 U.S.C. § 1291 states:

13. *See Also* 28 U.S.C. § 1292(a)(1), as amended April 2, 1982, Pub.L. 97–164, Title I, § 125, 96 Stat. 36. The Federal Courts Improvement Act of 1982, Pub.L. 97–164, 96 Stat. 25, the source of these amendments to 28 U.S.C. §§ 41, 1291, and 1292, dealt primarily with the creation of the United States Court of Appeals for the Federal Circuit. Although the post-transitional

period jurisdiction of appeals from decisions of the former United States District Court for the District of the Canal Zone was not the focus of Pub.L. 97–164, debate over the merits and mechanisms of this country's divestiture of sovereignty over the Panama Canal Zone was so recently in the public and congressional consciousness that we think it unlikely that failure

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the *United States District Court for the District of the Canal Zone,* the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. . . .

As amended April 2, 1982, P.L. 97–164, Title I, § 124, 96 Stat. 36 [emphasis added]. In its current form, 28 U.S.C. § 41 states, in pertinent part:

The thirteen judicial circuits of the United States are constituted as follows:

| Circuits | Composition |
| --- | --- |
| * * * | * |
| Fifth . . . . . . . . . . . . . . . | *District of the Canal Zone,* Louisiana, Mississippi, Texas. |
| * * * | * |

As amended April 2, 1982, P.L. 97–164, Title I, § 101, 96 Stat. 25 [emphasis added].

■ In light of the plain language of the current versions of these statutes, we have jurisdiction over this matter unless some subsequent enactment has effected an implied repeal of those portions of the statutes which mention the Canal Zone district court. Claims that legislation has been "impliedly repealed" are viewed with disfavor; if at all possible, seemingly inconsistent provisions are interpreted so as to give effect to both. *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80

(1981); *Allen v. McCurry,* 449 U.S. 90, 99, 101 S.Ct. 411, 417, 66 L.Ed.2d 308 (1980).

Were it not for the amendments (effective April 1, 1981) to 28 U.S.C. §§ 41 and 1291, two separate laws might be sources of an implied repeal of our § 1291 mandate to review decisions of the Canal Zone district court. One of those laws is the Panama Canal Treaty itself. The other is the Panama Canal Act of 1979,[14] a comprehensive act designed to implement the treaty.

By the Panama Canal Treaty, the United States relinquished sovereignty over the Canal Zone, ending a regime that had prevailed since 1903.[15] As of October 1, 1979, the date the treaty entered into force, the Republic of Panama "reassume[d] plenary jurisdiction over the former Canal Zone . . . ." Treaty, Art. XI, § 1. However, "[i]n order to provide for an orderly transition to the full application of the [new] jurisdictional arrangements," the treaty provided a thirty-month transitional period. *Id.* During this period (from October 1, 1979 through March 31, 1982), "the civilian courts of the United States of America in the Republic of Panama" had no jurisdiction over new civil cases, but retained full jurisdiction "to dispose of any civil cases, including admiralty cases, already instituted and pending . . . prior to the entry into force of [the] Treaty [ (October 1, 1979) ]." *Id.* Art. XI, § 6. Mr. Egle's divorce action, filed on August 13, 1979, was thus among the last of the civil cases filed in the district court.

The drafters of the treaty were aware that all civil cases pending in the Canal Zone courts as of October 1, 1979, might not

to remove from sections 41, 1291, and 1292 references to the Canal Zone district court was merely an oversight.

**14.** Pub.L. 96–70, 93 Stat. 493 (September 27, 1979).

**15.** The Panama Canal Treaty superseded a 1903 agreement between the United States and Panama that, in its Article III, granted the United States the right to exercise in the Canal Zone all the rights, power, and authority "which the United States would possess and exercise if it were the sovereign of the territory . . . to the entire exclusion of the exercise by

the Republic of Panama of any such sovereign rights, power or authority." Convention for the Construction of a Ship Canal, *done* Nov. 18, 1903, 33 Stat. 2234, T.S. No. 431, *reprinted in* Canal Zone Code Appendix at 428 (1963). One of the rights of a sovereign is the right to administer justice, and, accordingly, in 1904 the United States created a complete system of courts for the Canal Zone. *See* 3 C.Z.Code Annotated § 1 and annotations thereto. Pursuant to the statutory predecessors of 28 U.S.C. §§ 41, 1291 and 1292, this court was vested with appellate jurisdiction to review decisions of the Canal Zone district court.

be finally adjudicated by the end of the thirty-month transitional period. Thus, section 7 of Article XI provided that the United States and Panama

shall consult concerning procedural and substantive matters relative to the implementation of this Article, including the disposition of cases pending at the end of the transition period and, in this respect, may enter into appropriate agreements by an exchange of notes or other instruments.

Unfortunately, the consultations contemplated by section 7 never took place, and therefore we have no clear guidance as to how the present appeal should be handled. At the close of the transitional period the district court was abolished.

Mr. Egle argues that the literal language of the treaty removed the appellate jurisdiction of this court to review decisions of the former United States District Court for the District of the Canal Zone as of April 1, 1982, even where a timely appeal was filed before that date but was not decided on or before March 31, 1982. The relevant provi-

sions [16] of the treaty do not specifically mention this court or specifically distinguish between appellate and district court jurisdiction during the transitional period. The treaty does not expressly abolish our appellate jurisdiction (as of April 1, 1982) of decisions made by the district court during the transitional period.

Mr. Egle's argument is really one of "implied repeal". In his view, the reference in section 6 of Article XI to "the civilian courts of the United States of America in the Republic of Panama" includes the United States Court of Appeals for the Fifth Circuit, and the phrase "during the transition period" therefore limits appellate jurisdiction as well as the jurisdiction of the district court. He notes the obvious practical difficulties that the abolition of the district court entails, and argues that the lack of an available forum to which to remand the action should such a disposition be necessary requires us not to consider the appeal at all. That the drafters of the treaty did not provide a mechanism other than consultation by the respective governments for

**16.** The pertinent provisions of that treaty are contained in sections 1, 5, 6 and 7 of its Article XI:

Article XI
PROVISIONS FOR THE TRANSITION PERIOD

1. The Republic of Panama shall reassume plenary jurisdiction over the former Canal Zone upon entry into force of this Treaty and in accordance with its terms. In order to provide for an orderly transition to the full application of the jurisdiction arrangements established by this Treaty and related agreements, the provisions of this Article shall become applicable upon the date this Treaty enters into force, and shall remain in effect for thirty calendar months. The authority granted in this Article to the United States of America for this transition period shall supplement, and is not intended to limit, the full application and effect of the rights and authority granted to the United States of America elsewhere in this Treaty and in related agreements.

\*     \*     \*     \*     \*     \*

5. The courts of the United States of America and related personnel, functioning in the former Canal Zone immediately prior to the entry into force of this Treaty, may continue to function during the transition period for the judicial enforcement of the jurisdiction to be exercised by the United States of America in accordance with this Article.

6. In civil cases, the civilian courts of the United States of America in the Republic of Panama shall have no jurisdiction over new cases of a private civil nature, but shall retain full jurisdiction during the transition period to dispose of any civil cases, including admiralty cases, already instituted and pending before the courts prior to the entry into force of this Treaty.

7. The laws, regulations, and administrative authority of the United States of America applicable in the former Canal Zone immediately prior to the entry into force of this Treaty shall, to the extent not inconsistent with this Treaty and related agreements, continue in force for the purpose of the exercise by the United States of America of law enforcement and judicial jurisdiction only during the transition period. The United States of America may amend, repeal or otherwise change such laws, regulations and administrative authority. The two Parties shall consult concerning procedural and substantive matters relative to the implementation of this Article, including the disposition of cases pending at the end of the transition period and, in this respect, may enter into appropriate agreements by an exchange of notes or other instrument.

\*     \*     \*     \*     \*     \*

post-transitional period disposition of cases pending in the district court or cases on appeal, and that no consultation has occurred, requires us, according to Mr. Egle, to leave the parties where they stood at midnight of March 31, 1982.[17]

The scope of the reference in section 6 to "the civilian courts" is not so clear, however. We might be persuaded that this choice of wording (as opposed to the specific wording, "the United States District Court for the District of the Canal Zone") was meant to include this court as well as the district court, but for the fact that the Canal Zone Code provided for American courts other than the district court.[18] A choice of wording broader than the formal title of the former district court does not necessarily suggest inclusion of this court within the scope of section 6. Additionally, the wording "the civilian courts of the United States of America" is modified by the phrase "in the Republic of Panama," a phrase that is ostensibly geographic in scope. While section 6 could be construed as referring to all civilian courts exercising any jurisdiction over cases filed in the Canal Zone courts, the phrasing on which Mr. Egle relies is at best ambiguous in its support of his interpretation.

The treaty's abolition of the district court did not necessarily eliminate all possibility that a remand procedure might be constructed which would be consistent with this Court's retention of appellate jurisdiction of the Canal Zone district court's decisions. We note that during the second session of the Ninety-seventh Congress, a bill was introduced which would have transferred jurisdiction and venue of civil actions pending in the Canal Zone district court on March 31, 1982, to the United States District Court for the Eastern District of Louisiana.[19] Unfortunately (for its passage would have solved the jurisdictional problem presented by this case), that bill languished in the committee to which it was assigned. However, both the procedure set forth in that bill, and the consultation provision of Article XI, section 7 of the treaty suggest that the treaty was not so inflexible as to require that a case pending at the close of the transitional period could not be decided on appeal after the end of that period where filings were otherwise timely.

The other possible source of an implied repeal of our jurisdiction to review this case, the Panama Canal Act of 1979 neither expressly states nor implies that this court's appellate jurisdiction over Canal Zone district court cases is to terminate on any

---

**17.** Mr. Egle correctly observes that the same panel of this Court as that to which the Egle case was originally assigned, in an unpublished opinion dated March 29, 1982, granted a Canal Zone prisoner's motion to expedite his appeal and reversed his convictions. That per curiam opinion reads, in its entirety:

IT IS ORDERED that appellant's motion to expedite the appeal in this case is GRANTED.

The appellant having served a substantial portion of his sentence, and his sentence being one for misdemeanors only, *and the jurisdiction of this court being within three days of termination* so that there is no time for oral argument on this appeal, his convictions are REVERSED.

*United States v. Allen,* 673 F.2d 1325 (5th Cir. 1982) [capitalization in original, emphasis added].

The supposition in *Allen* that the Fifth Circuit's appellate jurisdiction of appeals from criminal convictions entered by the former district court would not survive the transitional period, while understandable in view of the time constraints then existing, is simply wrong.

The Panama Canal Treaty, in sections 2, 3 and 8 of Article XI of the treaty gives the United States even broader jurisdiction (over most American citizens in the former Canal Zone) in criminal matters than in civil matters, and our jurisdiction over the *Allen* appeal clearly would have continued beyond March 31, 1982.

**18.** Pursuant to the Canal Zone Code, the American courts established in the Canal Zone were the district court (comprising two divisions) and Magistrates' Courts in the various subdivisions of the Canal Zone. C.Z.Code tit. 3, §§ 1, 2 and 81.

**19.** H.R. 5601 would have repealed certain laws as of April 1, 1982, would have provided for transfer to the United States District Court for the Eastern District of Louisiana of cases pending in the United States courts in Panama at the end of the transitional period, and would have vested jurisdiction in the United States District Court for the Eastern District of Louisiana in criminal proceedings on certain federal offenses committed by certain United States citizens in Panama after March 31, 1982.

particular date. Indeed, 22 U.S.C. § 3841 (the codification of Title II, § 2201 of the Panama Canal Act of 1979) specifically names only the United States District Court for the District of the Canal Zone and the former Canal Zone's "magistrates' courts" as subject to the jurisdictional limitations of Article XI of the Panama Canal Treaty. 22 U.S.C. § 3841(a); *see also* House Report No. 96–98 Part I, *reprinted in* 1979 U.S. Code Cong. & Adm.News 1034, 1081–82.

■ But even if we were persuaded that either the Panama Canal Treaty at the time of its ratification or the Panama Canal Act of 1979 at the time of its enactment implied a repeal of 28 U.S.C. §§ 41 and 1291, the amendments to those statutes, effective April 2, 1982, remove the necessary chronological foundation of an implied repeal. Under our Constitution, treaties and statutes are equal in dignity. If a treaty and a statute are inconsistent, "the one last in date will control the other . . . ." *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Brandon v. S.S. Denton*, 302 F.2d 404, 414 (5th Cir. 1962). Both the treaty and the 1979 Act antedate these amendments, and the amendments left intact references in §§ 41 and 1291 to our appellate jurisdiction of decisions of the Canal Zone district court.[20]

### III. The Merits of the Modification Order

■ Our conclusion that the Panama Canal Treaty does not remove our post-March 31, 1982 appellate jurisdiction over decisions of the former district court requires us to review Judge McFadden's modification of the Egles' custodial and property rights on its merits. Custody decrees, even when denominated as "final" are by nature subject to modification as circumstances change. *Titcomb v. Superior Court*, 220 Cal. 34, 29 P.2d 206, 209 (1934). Whether a modification is warranted depends upon the facts and circumstances of each case, and the trial court's broad discretion to modify a custody decree will not be disturbed absent an abuse of that discretion or application of an erroneous legal standard. *See In re the Marriage of Ciganovich*, 61 Cal.App.3d 289, 132 Cal.Rptr. 261, 264 (1976); *Philbin v. Philbin*, 19 Cal.App.3d 115, 96 Cal.Rptr. 408, 410 (1971).

■ There is some authority for the proposition that a court's discretion to modify the custody or visitation provisions of a divorce decree, while broad, is less broad than the discretion possessed at the time that the original decree is fashioned. *Teta v. Teta*, 297 So.2d 642, 646 (Fla.Ct.App. 1974). However, such statements as to the limits upon discretion to modify an existing decree merely account for the fact that the standard in setting custody and visitation rights is the best interests of the children while the standard for modification is whether circumstances have changed which materially affect those interests. There must, of course, be sufficient evidence to support the district court's factual findings which form the basis for the modification ordered. *See Davis v. Davis*, 41 Cal.2d 563, 261 P.2d 729, 731 (1953); *Disney v. Disney*, 121 Cal.App.2d 602, 263 P.2d 865, 869 (1954). In reviewing the sufficiency of the evidence to support those findings, however, we must view the evidence in the light most favorable to the appellee. *In re the Matter of Volkland*, 74 Cal.App.3d 674, 141 Cal.Rptr. 625, 628 (1977).

■ We find Mr. Egle's argument that the Canal Zone Code provided for a lesser standard than the "change of circumstances" standard, while having some basis in the literal wording of that Code, unsupported by case law, practical experience, logic, or common sense. Section 235 of Title 8 of the Canal Zone Code states, in pertinent part:

---

**20.** At the same time that we requested supplemental briefs from the parties, we asked the Legal Advisor of the United States Department of State to present the Department of State's views on the jurisdictional questions raised by this case. As amicus curiae, the Department of State, in conjunction with the Civil Division of the Department of Justice, thereupon filed a brief and participated in oral argument. We note that the position of the executive branch (as asserted in the amicus brief and on oral argument) is in accordance with our own, that neither the Panama Canal Treaty nor any subsequent act of Congress has repealed our section 1291 jurisdiction to review this case.

The court, in rendering a decree of divorce may make such order touching the alimony and maintenance of the husband or wife, the care, custody, and support of the children, or any of them, as from the circumstances of the parties and the nature of the case, is reasonable and just.... On application, the court may, from time to time, make such alterations in the allowance of alimony and maintenance and the care, custody, and support of the children *as appear reasonable and proper....*

C.Z.Code tit. 8, § 235 (1962), 76A Stat. 1, 684 (1962) [emphasis added]; redesignated and continued partially in force by the Panama Canal Act of 1979, Pub.L. No. 96–70, § 3303(b), 93 Stat. 452, 499. From this statute, Mr. Egle argues that modification of custody need not be premised upon a change in circumstances but must merely be "reasonable and proper" in light of the welfare and best interests of the children. Such a view denies any finality to custody decrees; modification hearings under Mr. Egle's interpretation of section 235 are *de novo* proceedings rather than an examination focusing upon whether any changed circumstances justify a change in custody.

Mr. Egle does not cite any case from the former district of the Canal Zone which applies his interpretation of section 235. Indeed, neither party has cited any case which construes that section, nor has our research disclosed any such case.[21]

Even California cases, which the appellant's counsel urges are likely to be more appropriate in construing provisions of the Canal Zone Code than are cases from other jurisdictions,[22] generally apply the "change in circumstances" rule to motions for modification of divorce decrees. *E.g., Titcomb, supra; Ciganovich, supra; Philbin, supra; Thompson v. Thompson,* 142 Cal.App.2d 741, 298 P.2d 866 (1956). Interestingly, the California cases apply the change in circumstances standard even though the relevant section of the California Civil Code—like section 235 of the Canal Zone Code—does not explicitly state that a finding of a change in circumstances material to the best interests of the children is a prerequisite to modification of a divorce decree. Section 4603 of the California Code states, in its entirety:

Without filing a petition pursuant to Section 4503, husband or wife may bring an action for the exclusive custody of the children of the marriage. The court may, during the pendency of such action, or at the final hearing thereof, or afterwards, make such order or decree in regard to the support, care, custody, education and control of the children of the marriage as may be just and in accordance with the natural rights of the parents and the best interests of the children. Such order or decree may be modified or revoked at any time thereafter *as the natural rights of the parties and the best interests of the children may require.*

21. The absence of published Canal Zone cases touching upon modification of divorce decrees requires us to turn to cases from other jurisdictions for guidance in deciding this one. The only case which conceivably supports the argument that section 235 does not require a showing of a change in circumstances but merely requires that modification be "reasonable and proper" is *In re Adoption of Adella Markert,* cited in the Canal Zone Code Annotated as "3 C.C. 501 (D.C.C.Z.Bal.Div.1925)"; see 3 C.Z. Code Annotated at 308. Assuming that *Markert* is somewhere available in published form, it predates the most recent version of the Canal Zone Code (1962) and the 1934 version of that code.

22. Appellant's counsel, who practiced law in the former Canal Zone for several years, informed us during oral argument that the Canal Zone Code was "patterned" upon the California Code. *See also* 3 C.Z.Code Annotated at 310, noting that the "Code of the Canal Zone (1934) was an adaptation to a great extent of the laws of California with reference to property rights of husband and wife." As the Canal Zone Code Annotated indicates, the current section 235 was "based on" section 120 of Title 3 of the Code of the Canal Zone (1934), but the notation indicates that section 120 of the 1934 Code was derived from earlier federal provisions. *Id.* at 307. Although we accept the general proposition that much of the 1934 Code was based on the California Civil Code and that the 1962 Canal Zone Code may still be largely traceable to earlier California law, the precise origin and development of section 235, fascinating as it may be, is a task which, under the circumstances, we have decided to forego.

[Emphasis added.] Section 4603, with its reference to "the natural rights of the parties and the best interests of the children" is arguably as broad and as amorphous as the "reasonable and proper" phrase contained in section 235 of the Canal Zone Code, but the California courts have nonetheless usually required a showing of changed circumstances before modifying decrees.

The Virgin Islands Code presents a similar situation where an arguably broad status (Virgin Islands Code § 110), containing no reference to a finding of a change in circumstances being a prerequisite to the modification of a divorce decree, has been construed as requiring such a finding. *See Viles v. Viles,* 316 F.2d 31, 34 (3d Cir.1963). Indeed, almost every American jurisdiction has imposed the "change of circumstances" requirement, as a prerequisite for modification of a divorce decree, without the benefit of express language in the controlling statute. *Id.* As Judge Hastie explained in *Viles,* "[i]f either party to a divorce were permitted to invoke at will a full hearing and de novo adjudication ... the divorce law would become a potential vehicle for harassment and a source of wasteful litigation." *Id.* We conclude, therefore, that the general rule that modification of a divorce decree must be premised upon a change of circumstances is applicable to section 235 of the Canal Zone Code. Indeed, Mr. Egle apparently recognized the applicability of the change of circumstances rule at the time when he merely sought an expansion of his visitation rights, arguing that the change to the "6–4 Work Plan" constituted a material "change of circumstances."

Mrs. Egle attacks Judge McFadden's change of custody on several grounds. She argues that the record does not reflect an attempt on her part to conceal the children's whereabouts from her former husband or to turn them against their father emotionally. She also argues that Judge McFadden was improperly punishing her for instituting a parallel action in the Circuit Court in and for Dade County, Florida, and for failing to dismiss that action quickly enough. In conjunction with these arguments, she argues that the relevant period to be examined for the occurrence of any change of circumstances is very brief. In her view, to support the modification, a change in circumstances must have occurred between entry of the final divorce decree on June 19, 1981, and the entry, on December 15, 1981, of Judge McFadden's order modifying that decree, and we ought not examine the period marked by the entry of the interlocutory decree (July 18, 1980) and the entry of the final decree. She also argues that if a change in circumstances occurred, Judge McFadden erred in concluding that a change in custody was in the best interests of the children.

From our own examination of the record, we conclude that there was sufficient evidence to support Judge McFadden's finding that Mrs. Egle had attempted to interfere with her former husband's maintenance of a parental relationship with his children, and we cannot conclude that this finding was "clearly erroneous." Nor can we conclude that Judge McFadden erred in determining that Judge Pittman's order put her on notice that further interference with Mr. Egle's exercise of his visitation rights might jeopardize her custody of the children and that Mrs. Egle had not heeded Judge Pittman's warning.

The question of whether Mrs. Egle acted in disregard of her former husband's rights as a parent by attempting to alienate his children from him and to frustrate his exercise of visitation rights hinges upon the credibility of witnesses. Giving due regard to Judge McFadden's opportunity to assess their credibility, we cannot say that it was clearly erroneous to conclude that the truth was closer to Mr. Egle's version of the facts than to that asserted by Mrs. Egle. It is significant that the guardian corroborated Mr. Egle's testimony in every key respect.

Furthermore, Mrs. Egle's testimony that she believed that she had told the guardian on July 17 that she was thinking of moving from Miami might easily be viewed as incredible, given the guardian's testimony and the absence of any similar musings by Mrs. Egle to her former husband. The way in which Mrs. Egle carried out her move to

Palm Coast supports the inference that her intent was, at least in substantial part, to impede visitation. Although the testimony of both Mr. and Mrs. Egle and of the guardian is largely general and impressionistic, and specifies particular incidents altogether too infrequently, their testimony adduced a sufficient basis to support Judge McFadden's findings.

■ Nor was it improper for Judge McFadden to hear evidence on, and consider, events which occurred before June 19, 1981, the date of entry of the final decree. Mr. Egle alleged not only particular incidents occurring after that date, but also a continuation of a pattern of conduct. Although the focus of the hearing was properly on incidents which occurred after entry of the final decree, the theory that a continuing violation of rights had occurred makes Mrs. Egle's narrow view of the relevant time period unpersuasive. Both Judge McFadden and Judge Pittman had found in earlier hearings that Mrs. Egle had attempted to frustrate her former husband's exercise of parental rights. As the record indicates, Judge McFadden had frequent involvement in and extensive familiarity with the circumstances of this case. Cf. Davis v. Davis, 41 Cal.2d 563, 261 P.2d 729, 731 (1953) (same trial judge presided at both the divorce trial and at the subsequent modification hearings, and could be presumed to be familiar with circumstances existing at both times). Events prior to entry of the final decree were background information which placed later incidents in context and were relevant to the question of whether Mrs. Egle had continued to act in a manner contrary to Judge Pittman's warning.[23]

We reject the suggestion that Judge Pittman's order did not put Mrs. Egle on notice that conduct in violation of the order might have consequences unfavorable to her. That order stated a clear warning that her past conduct had been unreasonable and unfair. While Judge Pittman's order did not state that future violations of Mr. Egle's visitation rights or future attempts to alienate the children from their father might result in sanctions, possibly including changing custody to the father, that is the obvious implication of his order.

Having found that the evidence was sufficient to support Judge McFadden's findings that Mrs. Egle had continued to interfere with her former husband's rights to visit and maintain parental relationships with their children, the question for our review is merely whether those findings either constitute a "change of circumstances" which justified a change of custody or come within an exception to the general rule such that a change of custody was appropriate even if no "change of circumstances" had occurred.

■ The requirement that a change of circumstances be shown before custody will be changed is not an ironclad rule. Immerman v. Immerman, 176 Cal.App.2d 122, 1 Cal.Rptr. 298, 300 (1960); In re Walker, 228 Cal.App.2d 217, 39 Cal.Rptr. 243, 246 (1964). A showing of sabotage or deliberate frustration of visitation rights provides an alternative ground for a change of custody and obviates the need to show a change of circumstances. Ciganovich, 132 Cal.Rptr. at 264.

■ For example, as a general rule the custodial parent is entitled to change residences unless the move is detrimental to the child. Ciganovich, 132 Cal.Rptr. at 263. That the change of habitation practically deprives one parent of visitation rights is generally insufficient to justify restraint upon the custodial parent's freedom of movement. Id. However, the general rule does not govern when the custodial parent's intent in changing residences is to frustrate or destroy the other parent's visitation rights. Id.; Walker v. Superior Court, 246 Cal.App.2d 749, 755, 55 Cal.Rptr. 114, 117 (1966); see also Rosin v. Superior Court, 181 Cal.App.2d 486, 500, 5 Cal.Rptr. 421, 429 (1960). Where a motive to conceal the chil-

---

**23.** Nor do we think that entry of the final decree on July 19, 1981, bars inquiry into conduct occurring before that date where the ratification of the interlocutory decree was, as Judge McFadden explained during the modification hearing, in reality a mechanical administrative task.

dren from the non-custodial parent or otherwise frustrate that parent's right to visit and maintain contact with the children can reasonably be inferred from the circumstances surrounding the move by the custodial parent, a change in custody may be appropriate as a means of assuring that the rights of both parents (and those of the minor children) will be honored. *Ciganovich,* 132 Cal.Rptr. at 264.

Judge McFadden found that Mrs. Egle continued to disregard her former husband's rights to visit and communicate with his children, despite Judge Pittman's warning against continuation of such conduct. As indicated, the record contains sufficient evidence in support of that finding and we cannot say that it was clearly erroneous.

▮ Mrs. Egle's conduct clearly came within a recognized exception to the general rule that a change of custody must be based upon a showing of a material change of circumstances. *See Ciganovich, supra.* Judge McFadden's order changing custody would be appropriate even if Judge Pittman had not previously entered an order warning Mrs. Egle against continuing to interfere with her former husband's rights. That warning, however, set forth an expectation that Mrs. Egle would refrain from interfering with her former husband's rights. In light of Judge Pittman's warning, her subsequent conduct can be viewed as a change from the circumstances and conduct which was anticipated at the time that primary custody was awarded to her.

▮ Mrs. Egle also argues that Judge McFadden erred in concluding that a change of custody was in the best interests of the children. She notes the guardian's opinion that notwithstanding attempts to alienate the children from their father, Mrs. Egle was a good mother and should retain primary custody. Mrs. Egle argues that her intent in moving to Palm Coast was to provide the children with a more spacious home than was available to her in Miami, and that she regarded Palm Coast as a

better place to raise children than either Miami or the former Canal Zone.

On the basis of this record, we think that Judge McFadden was entitled to disagree with the guardian on the ultimate question of whether primary custody should be taken from Mrs. Egle and given to Mr. Egle. The preservation of relationships with both parents is normally in the best interests of children, and we see no evidence in this record which indicates that maintenance of relationships with their father was not in the Egle children's best interests. Mrs. Egle's continued attempts to sabotage her former husband's maintenance of a parental relationship with them casts doubt upon her fitness to be the custodial parent. *See Ciganovich,* 132 Cal.Rptr. at 264. In an instance where the custodial parent has demonstrated an unwillingness to observe the other parent's right to maintain contact with their children (and the children's right to maintain contact with the non-custodial parent), it may well be that the children's best interests will be served by changing primary custody to the parent who is more likely to honor the other parent's (and the children's) rights.

Mrs. Egle relies on *Doran v. Doran,* 212 So.2d 100 (Fl.Ct.App.1968), a case presenting similar facts and in which a change of custody was reversed on appeal. In *Doran,* the trial court found the wife in contempt of court for harassment of her former husband and frustration of his rights to visit their children. Following that initial hearing, however, the trial court declined to remove custody from Mrs. Doran, and gave her an opportunity to purge herself of contempt through future compliance with the divorce decree. At a second hearing over a year later, the trial court found that Mrs. Doran had continued to deny her former husband his visitation rights and to harass him.[24] The trial court found Mrs. Doran in contempt of its earlier directive, sentenced her to thirty days in jail, and changed cus-

---

24. This "harassment" took the form of "throwing rocks and eggs at ... [his] residence, splattering paint on his apartment, precipitating physical violence with a girl friend of ... [her former husband], damaging his car and placing innumerable phone calls to his place of business." *Doran,* 212 So.2d at 104.

tody of the children to Mr. Doran indefinitely.

The Florida Court of Appeals reversed, concluding that although Mrs. Doran's conduct was clearly "irrational" and that the finding of contempt and a jail sentence were appropriate, custody should not have been taken from her as "an additional penalty" upon her release from confinement without a showing that anything beyond "a few isolated incidents" had occurred in the presence of the children and might create emotional disturbances in them or otherwise be detrimental to their welfare. 212 So.2d at 103 and 105.

As indicated, the testimony in this case was frequently general, rarely focusing upon specific incidents. Nonetheless, there is evidence (in the testimony of Mr. Egle and of the guardian) of Mrs. Egle's statements about her former husband being made to or in the presence of the children, and evidence that the elder child had experienced significant emotional or psychological problems in connection with his parents' divorce. Given the manner of the move to Palm Coast, as well as Mrs. Egle's earlier attempts to evade her former husband and hide the children from him, we find it very difficult to believe that the Egle children were unaware of their mother's hostility toward their father.

As we have noted, the former District of the Canal Zone does not offer published cases which dispose of (or suggest an appropriate disposition of) this case. As between *Doran* and *Ciganovich,* we think that *Doran* is overly tolerant of irrational and vindictive behavior on the part of the custodial parent, and that *Ciganovich* is more persuasive in emphasizing the importance of maintaining children's relationships with both of their divorced parents and of placing the children with that parent who appears willing to honor the rights of the children and of the other parent.

The guardian opined that frequent visitation and summertime custody would be sufficient to enable Mr. Egle to maintain parental bonds with his sons until they were mature enough and sufficiently independent of mind to disregard their mother's attitude toward their father. We cannot conclude, however, that Judge McFadden abused his discretion in rejecting a recommendation for continuation (with some tinkering) of an arrangement which had been under considerable strain previously and had broken down in connection with Mrs. Egle's move to Palm Coast. Given the record, Judge McFadden was entitled to conclude that the existing arrangement had been proven unsatisfactory, and that Mr. Egle was more likely to honor his former wife's rights to visit and communicate with the children than she was to honor his rights to do the same.

Mrs. Egle may have had the best of intentions in moving to Palm Coast, and, apart from considerations of maintaining contact with both parents, Palm Coast may well be a "better" place than Miami or the former Canal Zone in which to grow up. But the way in which Mrs. Egle carried out this move supports the inference that her intent was, at least in substantial part, to impede visitation. Nor can we conclude that Judge McFadden erred in deciding that whatever financial, environmental, educational, and other advantages Palm Coast may possess vis-a-vis Miami or the former Canal Zone do not outweigh the benefits of maintaining relationships between these children and each of their parents.

■ Mrs. Egle characterizes Judge McFadden's decision as motivated by a desire to punish her for her failure to dismiss her Dade County lawsuit for several weeks following receipt of his order to do so. When he found Mrs. Egle in contempt, Judge McFadden declined to impose a fine or period of imprisonment, and stated that his finding of contempt would not determine his decision on modification of custody. Judge McFadden later cited her institution of the Dade County lawsuit as "designed to harass and whipsaw her former husband," and implied that her violation of his order to dismiss the action was prompted by the same motive. While failure to dismiss that lawsuit reasonably expeditiously might not itself support a change of the custody arrangement in this case, we think

that Judge McFadden, notwithstanding his statement that his finding of contempt was not determinative of his decision, was certainly entitled to consider that conduct, not for purposes of punishment, but, as part of Mrs. Egle's pattern of behavior in discharging her obligations as the custodial parent. As indicated, a valid reason (the preservation of the children's right to maintain relationships with their father and his right to maintain parental relationships with them) existed for this change. We find no evidence that suggests that Judge McFadden regarded that reason as a pretext for an unacknowledged motive.

In passing, we note that since Mrs. Egle is now married to a resident of Panama, also a canal ship captain, and spends substantial time there, the practical consequences of Judge McFadden's order, so far as her visitation rights are concerned, are less difficult for her than if she had remained exclusively a Florida resident. Assuming, as we must and do, that Captain Egle will fully respect her visitation rights, as she did not respect his, we may hope that the present arrangements will be in the best interests of all concerned, particularly their two sons.

As indicated, Judge McFadden also reinstated Judge Pittman's order compelling Mrs. Egle to convey to her former husband her interest in their Maryland home in return for $10,000.00. Judge Pittman had previously, on August 15, 1980, set aside that order upon concluding that sections 278 and 280 of Title 8 of the Canal Zone Code did not allow for the distribution of the parties' interests in real property located outside the Canal Zone (but governed only the distribution of their Canal Zone

property and of personal property located outside the Canal Zone).

We do not read sections 278 and 280 as restrictively as Judge Pittman read them, and conclude that these sections do permit the divorce court to allocate the parties' interests in real property located outside the Canal Zone in arriving at a fair and reasonable distribution of the parties' various property interests. *See also* C.Z.C. tit. 8, §§ 239 and 240.[25] Ordinarily, we would therefore allow Judge McFadden's reinstatement of Judge Pittman's initial order respecting the Egles' Maryland home to stand. However, we see no evidence in the record as to either the extent of Mrs. Egle's interest in the home (*i.e.,* what percentage of any amortization and of any improvements were made during the marriage) or the fair market value (in 1980, at the time of Judge Pittman's initial order) of the property. Not being in a position to determine the fairness of the exchange (at the time it was first ordered), we reverse Judge McFadden's reinstatement of Judge Pittman's order regarding this property, and we leave the parties to pursue whatever remedies are available to them in Maryland for the resolution of their respective interests in the property.

Judge McFadden also denied Mrs. Egle's request for attorneys' fees, reasoning that most of the legal work was the result of her own motions to modify the decree and by the defense of unwarranted conduct. At oral argument, counsel for Mrs. Egle stated that given the obvious problems in deciding where to remand this case should remand appear necessary or helpful, both he and his client had agreed to waive the issue of

**25.** Section 239 of Title 8 of the Canal Zone Code states:

> **§ 239. Disposition of community property on divorce**
>
> (a) In case of the dissolution of the marriage by the decree of the district court, the community property shall be assigned to the respective parties in such proportions as the court, from all the facts of the case, and the condition of the parties, deems just.
>
> (b) The court, in rendering a decree of divorce, shall make such order for the disposition of the community property, as is provided in this chapter, and, whenever necessary

for that purpose, may order a partition or sale of the property and a division or other disposition of the proceeds.

Section 240 of Title 8 of the Canal Zone Code states:

> **§ 240. Compelling conveyance of property belonging to other spouse**
>
> If it appears to the court that either party holds the title to property equitable belonging to the other, the court, in rendering a decree of divorce may compel conveyance thereof to the party entitled to it, upon such terms as it deems equitable.

attorney's fees. We therefore deem the appeal of the denial of attorney's fees withdrawn, and we need not consider whether Judge McFadden abused his discretion in denying the request in its entirety.[26]

### IV. Conclusion

For the reasons stated above, we affirm the district court's modification of the custody provisions of the final divorce decree. However, we vacate the reinstatement of an order mandating conveyance of certain real property located in Maryland. The remaining appeals in this case have been withdrawn. The district court's opinions and orders in this case are therefore AFFIRMED in part and VACATED in part.

---

**26.** That is not to say that appellant abandoned arguments as to possible remand on the custody issue (or on the custody issue together with other issues) via various statutory routes, *e.g.* 28 U.S.C. §§ 1405, 1406, 1631, and 2106. As we have not found remand on the custody issue (or the Maryland property issue) necessary, and as appellant has indicated willingness to forego review of the denial of fees if that would be the only issue that would be remanded to a lower court, it is unnecessary to explore whether authority to remand this case actually exists per any of the statutes cited by the appellant.