# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49666

CARLA ANN GRAY,

    Petitioner-Appellant,

v.

BRYAN DAVID GRAY,

    Respondent.

)
)
)
)
)
)
)
)

Boise, August 2022 Term

Opinion filed: October 18, 2022

Melanie Gagnepain, Clerk

Appeal from the Magistrate Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Wiley R. Dennert, Magistrate Judge.

The decision of the magistrate court is <u>affirmed</u>.

Parsons Behle & Latimer, Idaho Falls, for Appellant. John E. Cutler argued.

Roy, Nielson, Platts & McGee, Twin Falls, for Respondent. Eric Nielson argued.

_____

MOELLER, Justice.

This appeal concerns a divorced parent's decision to unilaterally relocate her child across international borders without (1) prior notice to the other parent or (2) leave of the court. Carla Gray appeals the magistrate court's order that modified the existing custodial arrangement and required her to return the child to the United States. For the reasons stated below, we affirm the magistrate court's modified judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background will be grouped into four distinct time periods: Bryan and Carla's personal history and marriage, their divorce, Carla's relocation of the parties' child to Costa Rica, and the subsequent petition for modification.

### A. Bryan and Carla: The Early Years

After receiving an honorable discharge from the U.S. Navy following six years of active duty in 2006, Bryan Gray obtained full-time employment at the Morro Bay Power Plant in California. While there, Bryan met Carla in the fall of 2008. Carla had recently graduated with a degree in genetics and was working as a laboratory technician at Allan Hancock College in Santa

Maria, California. After they began dating, Bryan was accepted to Rensselaer Polytechnic Institute in New York and, in December 2008, moved to New York "intently focused on his dream to get his Bachelor's Degree . . . ." Carla stayed in California. While in New York, Bryan encountered difficulty: secure housing was hard to come by and tuition that was higher than expected. He dropped out of Rensselaer after six weeks. In the spring 2009, Bryan moved back to California and into Carla's apartment. Bryan resumed work at the Morro Bay Power Plant. While there, Bryan completed his bachelor's degree in nuclear engineering technology at Thomas Edison State University in May 2010.

After graduation, "Bryan then set his sights on relaunching his career in the nuclear power industry." In September 2011, after learning the power plant where he was working would be closing, Bryan obtained employment at the Idaho National Laboratory's ("INL") Advanced Test Reactor in Idaho Falls, Idaho. Bryan took a significant pay cut to work at the Idaho National Lab. However, the INL offered to pay for a master's program in engineering for Bryan as a bonus. Bryan was accepted to Idaho State University's ("ISU") engineering program. While Bryan lived in Idaho Falls, Carla remained in California to complete her fifth year of employment at Hancock College, which was a "significant milestone" for her eligibility in the California Public Employees' Retirement System. Carla moved to Idaho Falls to be with Bryan in the summer 2012.

Bryan and Carla were married in December 2012 and purchased a home in Idaho Falls. Soon, Bryan became dissatisfied with his work at the INL but did not inform Carla. Bryan attempted to transfer within the INL but was told he would have to wait six months. Bryan quit his job in September 2014 after three years of employment. In December 2014, while still at ISU, Bryan changed his graduate programming and began taking prerequisite courses to become a physician's assistant ("PA"). Bryan excelled in his new studies—so much so that several professors encouraged him to enroll in medical school rather than PA school. By early 2016, Bryan decided to enroll in medical school. He began taking the prerequisite courses and started studying for the Medical College Admission Test ("MCAT").

In September 2016, Bryan and Carla's son, J.L.G., was born. Due to Bryan's study schedule, Bryan's interaction with J.L.G. was limited. Bryan adhered to a structured daily schedule—planning out every meal, break, and activity to maximize his study time. Bryan even sealed off the windows and doors to the basement to soundproof the basement and further maximize his study time. Carla, on the other hand, "did nearly all of the daycare for [J.L.G.]."

2

Further, Carla moved into her son's room within a month after J.L.G. was born. Shortly after Carla's move into their son's room, Bryan moved to the basement. During the first two years of J.L.G.'s life, Bryan's involvement was minimal. However, the magistrate court found that "[a] large part of why Bryan was not involved in parenting [J.L.G.] is because Carla would not let him." By the fall of 2017, the marriage began to fall apart and the couple began marriage counseling.

Bryan took the MCAT in 2018 and started to consider where to apply to medical school and how to pay for it. Bryan determined that he had two options to pay for medical school since he could not afford it himself: either have the state of Wyoming or the U.S. Navy pay for medical school. Both avenues covered the cost of tuition but also required a four-year commitment after medical school. However, the program in Laramie, Wyoming was only open to residents of Wyoming. Bryan wanted to move to Wyoming to establish residency to be eligible for Wyoming's program. As an added benefit, Bryan's parents lived within 45 minutes of Laramie and could provide a great deal of support to Bryan, Carla, and J.L.G. while he was in medical school.

Despite the financial benefits of moving to Wyoming if Bryan was accepted to the state program, Carla was not willing to move there. For Carla, "[t]here was too much uncertainty." For example, there were financial concerns: after living on their savings since Bryan quit his job, the home in Idaho Falls was the only asset that the couple had left. "Carla was not prepared to move under those circumstances." Bryan hoped Carla would change her mind but testified "he was moving to Wyoming one way or another . . . ." If Carla would not move with Bryan to Wyoming, then Bryan intended to file for divorce. Carla testified that she "did not want to move to Wyoming[,] and she decided she wanted a divorce too."

**B. The Divorce**

The couple then began the process of initiating divorce proceedings. Bryan initially drafted many of the terms for the divorce. At the time, he was willing to give Carla "sole legal custody" of J.L.G., but the magistrate court found that Bryan "did not fully understand what that meant." Bryan made estimates of how much free time he would have with his expected medical school schedule and possible military commitments, if he could not get into Wyoming's program. Since Bryan would get 30 days of leave per year from the military, he proposed a visitation schedule that included at least four weeks of visitation.

Bryan gave his drafted terms to Carla. He told Carla "to acquire the necessary paperwork to file a joint petition or that he would go out and hire his own attorney[,] which would make the

3

process much more unpleasant." Carla took Bryan's terms to her attorney who drafted the divorce paperwork and "included most of Bryan's terms." A joint petition for divorce and divorce settlement agreement were signed in July 2018. The judgment of divorce was entered on July 26, 2018. The relevant portions of the judgment, as it relates to the custody of J.L.G., provided the following:

4. Carla has sole legal and physical custody of the child subject to Bryan's visitation which will, at a minimum, consist of up to four weeks of parenting time each calendar year, exercised in increments of not less than one week and not more than ten days per visit, depending on his medical, residency and military schedule, subject to the following:

a. From the present time until age three, Bryan can see the minor from 7:00 a.m. to 7:30 p.m. on each day available.

b. From age three to age four, Bryan can see the minor from 7:00 a.m. to 7:30 p.m. on each day available and have up to two overnights per week.

c. From age four to age five, Bryan can see the minor from 7:00 a.m. to 7:30 p.m. on each day available and have up to four overnights per week.

d. From age five to age six, Bryan can have the minor child for an entire week, including overnights, with no restriction to where the visitation takes place. There needs to be at least two weeks separation between each block of time when Bryan has the minor child.

e. From age six to age seven, Bryan can have the minor child for two weeks of visitation, including overnights, with no restriction to where the visitation takes place. There needs to be at least two weeks separation between each block of time when Bryan has the minor child.

f. After the child reaches the age of eight, Bryan's visitation can be exercised in whatever blocks that he desires, with due consideration to the child's school and other circumstances.

g. Bryan is to give at least seven days advance notice before exercising any parenting time.

5. The following persons have rights of reasonable visitation with the minor child:

a. Lewis Bryan Gray, paternal grandfather.

b. Peggy Jean Gray, paternal grandmother.

c. David Hayward, paternal great grandfather.

d. Kevin Douglass Gray, paternal uncle.

e. Lee Neidengard, maternal grandfather.

f. Patricia Neidengard, maternal grandmother.

6. Both parties are entitled to reasonable telephonic of Skype type calls between the child and the parent not having the child. Both parties will use their best efforts to facilitate this contact. At a minimum, each party has up to one hour each week with priority being given for special event (e.g., Mother's Day, Father's Day, birthdays, and holidays).

7. . . .

8. Bryan is fully responsible for all transportation costs related to his visitation, which shall begin and end at the minor's place of residence.

Shortly after the Judgment was entered, Bryan moved to Granite Canyon, Wyoming, to live with his parents while he established residency in Wyoming. Bryan began a new job in Cheyenne, Wyoming in November 2018. While working in Cheyenne, Bryan applied to "approximately 10 medical schools." Bryan was accepted to the College of Osteopathic Medicine at Rocky Vista University's Southern Utah Campus, located in Ivins, Utah, and he was awarded a scholarship through the Navy. Bryan began medical school in summer 2019. Between the entry of the Judgment and starting medical school about a year later, Bryan had four in-person visitations with J.L.G. Additionally, Bryan had frequent video-chat calls with J.L.G.—typically on Sunday mornings.

After the divorce, Carla began an in-home daycare business with a neighbor. Sometime in late summer or early fall of 2019, Carla reconnected with a former boyfriend, Paul Dorr. Carla and Paul had been in a serious relationship approximately six years prior to Carla meeting Bryan in 2008. Paul visited Carla in Idaho twice in the fall of 2019. In November 2019, Carla visited Paul in Costa Rica where Paul owned several successful businesses. Carla began considering moving away from Idaho Falls with J.L.G. She considered California to move closer to her mother and sister. The magistrate court found that "Carla and Paul also discussed the possibility of her and [J.L.G.] moving to Costa Rica." Still, while Carla and Paul may have discussed Carla and J.L.G. moving to Costa Rica, the magistrate court found Carla never mentioned that possibility to Bryan or his parents.

In the summer of 2019, Bryan moved to Ivins, Utah, to begin medical school. However, "Bryan had several life altering experiences at medical school." From these experiences, Bryan became concerned about being an "absentee father." This, coupled with the intense medical school course load, caused Bryan to reevaluate his commitments to medical school, the U.S. Navy, and, ultimately, to his son. Consequently, Bryan decided to drop out of medical school after only six weeks. Initially, he moved back in with his parents, but by September 2019, he got a job at a power

5

plant near Rock Springs, Wyoming, to be closer to his son. Rock Springs is approximately four to five hours away from Idaho Falls, where Carla and J.L.G. still resided.

### C. Carla's Move to Costa Rica with J.L.G.

In late 2019, Bryan was hoping to see J.L.G. over Thanksgiving and Christmas; however, "he was unable to as Carla had different plans." For Thanksgiving 2019, Carla took J.L.G. to visit family in California. While there, Carla obtained a new California driver's license and registered to vote—all unbeknownst to Bryan. After the trip to California, Carla returned to Idaho on December 4, 2019. Bryan had a visit with J.L.G. on December 7 and 8, 2019—this visit, as the magistrate court found, "ultimately turned out to be Bryan's last in-person visit with J.L.G. in the United States (until after trial)." The magistrate court found that Carla left Idaho with J.L.G. on December 12, 2019, knowing "she was about to permanently leave Idaho following Bryan's visitation . . ." In so doing, the court determined she "purposefully and deceitfully withheld her intentions from Bryan during the said visit."

Bryan was not able to see J.L.G. for the Christmas holiday because Carla took him to Hawaii to visit her father. After Christmas, Bryan asked Carla about possible dates when he could spend time with [J.L.G.] in January 2020. In an email, he suggested multiple dates in January and February to Carla for potential visits with J.L.G., but Carla instead suggested Bryan come to California to see their son. She wrote:

> I am happy to accommodate a visit with [J.L.G.] in California during the second or third week of January on the dates you originally requested. I have conveyed the same to your parents as well. The last I heard from them your parents indicated that they did not intend to come out to California in January. *I have no set date when I plan to return to Idaho.* I will be very busy upon my return to California so if you decide to visit please let me know by the end of the weekend so I can plan accordingly. *Being in California has many benefits for [J.L.G.] and I.* [sic] *We are close to my mother and sister.* [J.L.G.] loves to get outside and explore the beach in the lovely weather and we are both enjoying the support and company of good friends.

(Emphasis added by magistrate court). The magistrate court found this response to Bryan was deceptive because "the inference reasonably drawn by Bryan [would be] that she was planning on returning to Idaho at some point." As mentioned in Carla's email, Bryan's parents also inquired about when they could visit J.L.G. and Carla gave what, in the magistrate's view, was a similarly deceptive response indicating that she had "no set date of when [she planned] to return to Idaho . . ."

6

It is not clear from the record when Carla moved to Costa Rica. Carla testified in two separate declarations that she and J.L.G. moved away from Idaho in November 2019. The magistrate court noted that, according to Carla, she and J.L.G. "spent approximately one month visiting her mother, sister, and friends in her hometown in California, approximately two weeks visiting her father . . . in Hawaii, and that they then moved to their 'permanent' residence of Costa Rica." The magistrate court did not find Carla's written testimony to be credible and specifically found it to be "deceptive." The court noted that Carla's written declarations, filed in 2020, were "extremely vague, and she gave no actual dates (or months) of when these incidents took place (except for her claim that she permanently moved from Idaho in November 2019)."

### D. The Petition for Modification

Due to the difficulty in communicating with Carla about visitation and other parenting matters, Bryan filed a petition for modification on January 27, 2020. At the time of filing the petition, Bryan still did not know that Carla and J.L.G. had already left the United States. The first time Bryan learned that Carla had moved their son to Costa Rica was in a court filing in February 2020. The magistrate court found that Carla was "dishonest or intentionally deceptive to Bryan, to his parents and to [the] court regarding her move to Costa Rica." Beyond her calculated dishonesty, the magistrate court determined "[o]nce Bryan moved nearer to [J.L.G.] in fall of 2019, Carla took actions to move out of the area quickly."

As noted, determining when Carla and J.L.G. arrived in Costa Rica proved difficult for the magistrate court throughout this case, but it ultimately made a finding:

> Because of Carla's lack of credibility, her often vague testimony, and the lack of any corroborating evidence as of the time of trial in this case, the court would not have been able to find substantial, reliable evidence that Carla and [J.L.G.] were actually in Costa Rica on January 22, 2020, or on January 27, 2020 when Bryan filed his Petition to Modify. It is only after she filed the Supplemental Affidavit of Carla Gray on November 12, 2021, with her timeline on pages 13-14, that the court can find Carla and [J.L.G.] arrived in Costa Rica on January 22, 2020.

Whatever the date of their arrival, Carla did not inform Bryan prior to moving their son to Costa Rica.

Bryan was unable to exercise his visitation rights throughout late 2019 and early 2020. Specifically, the magistrate court found "[b]y Christmas 2019, January 2020, and February of 2020, Carla was either denying visitation altogether or making it so difficult to see [J.L.G.] that it

7

was nearly impossible for Bryan to continue his relationship with [J.L.G.] from that point in a meaningful manner."

On February 20, 2020, Carla filed a motion to dismiss the petition to modify, citing a lack of jurisdiction in Idaho. It was through this filing Bryan learned, for the first time, that J.L.G. was residing in Costa Rica. Shortly thereafter, Bryan filed an emergency motion for the return of J.L.G. to the United States and for temporary visitation orders. Two weeks later, on March 18, 2020, the magistrate court held a hearing on Carla's motion to dismiss and Bryan's emergency motion for the return of J.L.G. to the United States. On April 13, 2020, the magistrate court issued its findings of fact and conclusions of law, an order denying the motion to dismiss, and an order denying the emergency motion to return J.L.G. to the United States. Importantly, the magistrate court decided these motions early in the proceedings, before the facts had been fully developed and the full extent of Carla's deception had been made clear. In denying Carla's motion to dismiss, the magistrate court concluded that Idaho had jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"). *See* I.C. § 32-11-101 et seq. The magistrate court also concluded that "[a]lthough Carla argues that Costa Rican courts are well equipped to handle this case, such argument is based on assumptions and speculations as no evidence to support said argument has been presented to this court. More importantly, Costa Rica is not a 'state' under the UCCJEA."

The magistrate court also denied Bryan's emergency motion for the return of J.L.G. to the United States and for temporary orders, finding that "nothing in the Judgment requires Carla or [J.L.G.] to remain living in Idaho." However, the magistrate court also found that "[t]he Judgment implicitly requires Carla to keep Bryan informed of [J.L.G.'s] place of residence because Bryan's visitation is to begin and end at [J.L.G.'s] place of residence." Additionally, "[t]he Judgment also implicitly requires Carla to keep the other relatives who have rights of reasonable visitation with [J.L.G.] . . . informed of [J.L.G.'s] place of residence because they would not be able to exercise their rights of reasonable visitation if they did not know where [J.L.G.] was residing." Therefore, the magistrate court ordered Carla to provide Bryan with J.L.G.'s home and school addresses within seven days and to update him on any changes within 24 hours. The magistrate court also concluded that Carla's actions were deceptive and deceitful and that Bryan's petition to modify alleged substantial and material changes in circumstances since the entry of the judgment.

Carla's deceit was not limited to events surrounding the move—she made patently false declarations to the magistrate court regarding child support payments. In a declaration submitted

to the magistrate court made in March 2020, Carla claimed that Bryan was delinquent in child support and provided no other financial assistance. However, the magistrate court found that claim to be "completely false." The magistrate court noted that Bryan paid for J.L.G.'s swimming lessons, a tumbling class, and health insurance. The magistrate court concluded that "Bryan has in fact provided other financial support for J.L.G. beyond his monthly child support obligation. Moreover, Bryan has been paying considerably extra child support since January 2020. Thus[,] Carla's claim on March 11, 2020, that Bryan provided no other financial assistance besides child support was patently false."

On April 22, 2021, Bryan amended his petition to modify, asserting that the COVID-19 pandemic made the existing visitation schedule unworkable, especially in another country. Additionally, Bryan sought changes to the custody and visitation arrangement, including which parent bears the cost of travel. A trial regarding the amended petition to modify was held on June 8–9, 2021. Of note was Carla's trial testimony as to why she did not inform Bryan of the international move prior to leaving the United States:

> [Carla's attorney]: [W]hy didn't you just tell Bryan ahead of time, "Hey, I'm thinking about moving to Costa Rica and taking [J.L.G.]?" Why didn't you just be open and honest with him, Carla?
>
> [Carla]: I was quite certain that given notice, he would take every legal action he could to prevent me from leaving Idaho Falls and that I would not have the opportunity. It had been a very long, dark period of time for me. I had a wonderful opportunity in front of me. I had the right to take it, and I took it. I brought my son to what I felt was a better life and a better life for myself as well. *And I -- you know, it's just better to beg forgiveness. I didn't want that opportunity to be taken from me*.

(Emphasis added).

On September 28, 2021, the magistrate court notified the parties that it had sua sponte decided to reopen the case to admit additional evidence regarding the living conditions and school arrangements in Costa Rica, Bryan's proposal for day-to-day care should he be granted custody, the specific dates that Carla and J.L.G. returned to the United States since the Petition to Modify was filed in January 2020, Carla's income, and any additional evidence that may be discussed at the evidentiary hearing. Subsequently, Carla and Bryan filed supplemental declarations and reply declarations. On March 10, 2022, the magistrate court entered its findings of fact and conclusions of law regarding the amended petition to modify and entered a modified judgment.

The modified judgment amended paragraphs 4, 8, and 14 of the original judgment, all concerning custody and visitation. The magistrate court concluded:

> After analyzing the best interests of [J.L.G.], the ideal parenting plan is for [J.L.G.] to live in the conterminous United States and for both parents to share joint physical custody with [J.L.G.] living primarily with Carla and with Bryan being awarded visitation as set forth in the parenting plan set forth in Parenting Plan Alternative #1, below. However, if Carla chooses not to return to live in the conterminous United States, then the next best parenting plan is for both parents to share joint physical custody with [J.L.G.] living primarily with Bryan in the conterminous United States and with Carla being awarded visitation pursuant to the parenting plan as set forth in Parenting Plan Alternative #2, below.

The modified judgment allowed Carla until July 15, 2022, to return with J.L.G. to the conterminous (lower 48 states) United States and retain primary physical custody or to remain in Costa Rica in which case Bryan would have primary physical custody. Under either scenario, Bryan and Carla were now granted "joint legal custody." Until J.L.G. was returned (between March 10 and no later than July 15, 2022), the magistrate court ordered that the parties have joint legal custody and Carla retain primary physical custody subject to Bryan's parenting time. The modified judgment contained a provision that "[n]either party shall relocate the minor child outside the conterminous United States, without the written agreement from the other party or an order from a court of competent jurisdiction, except that [J.L.G.] may continue to live primarily in Costa Rica until July 15, 2022."

Carla timely appealed.

## II.     STANDARD OF REVIEW

"In custody disputes, the awarding of custody of minor children rests within the sound discretion of the trial court and will not be upset on appeal absent an abuse of discretion." *Koester v. Koester*, 99 Idaho 654, 657, 586 P.2d 1370, 1373 (1978). When this Court reviews the decision of the magistrate court for an abuse of discretion, this Court determines whether the magistrate court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). "An abuse of discretion occurs when the evidence is insufficient to support a magistrate's conclusion that the interests and welfare of the children would be best served by a particular custody award or modification." *Nelson v. Nelson*, 144 Idaho

10

710, 713, 170 P.3d 375, 378 (2007). "When reviewing the trial court's findings of fact, the appellate court will not set aside the findings on appeal unless they are clearly erroneous such that they are not based upon substantial and competent evidence." *Id.*

"The question of where a burden of proof lies is a question of law, over which this Court exercises free review." *O'Connor v. Harger Const., Inc.*, 145 Idaho 904, 910, 188 P.3d 846, 852 (2008).

## III. ANALYSIS

Carla asserts three categories of error on appeal. First, Carla challenges the application of the burden of proof by the magistrate court. Second, she alleges that a collection of what she terms "*Weaver* Errors" occurred. Third, in addition to arguments made in her opening brief, Carla raises an additional due process argument in her reply brief for the first time. We will address each in turn.

### A. The magistrate court applied the correct burden of proof.

This Court has held for over 90 years that the standard in child custody cases is the best interests of the child. E.g., *Olson v. Olson*, 47 Idaho 374, 379, 276 P. 34, 35 (1929); *Rogich v. Rogich*, 78 Idaho 156, 160-61, 299 P.2d 91, 94 (1956); *Suter v. Biggers*, 157 Idaho 542, 546, 337 P.3d 1271, 1275 (2014) ("A court then will determine custody and where the children will reside using the best interests of the child standard.") (citing *Roberts v. Roberts*, 138 Idaho 401, 405, 64 P.3d 327, 331 (2003)). We have also held with similar consistency that, when there has been a material, permanent, and substantial change in circumstances, the standard in modification cases is also the best interests of the child. *E.g.*, *Tomlinson v. Tomlinson*, 93 Idaho 42, 47, 454 P.2d 756, 761 (1969); *Rogich v. Rogich*, 78 Idaho 156, 161, 299 P.2d 91, 94 (1956). By the 1970s, this Court held that "the rule governing changes of child custody is well settled and has been stated as follows:"

> A divorce decree granting custody of a minor child to one of the parties may not be modified unless there has been a material, permanent and substantial change in conditions and circumstances subsequent to entry of the original decree which would indicate to the court's satisfaction that modification would be for the best interests of the child.

*Poesy v. Bunney*, 98 Idaho 258, 261, 561 P.2d 400, 403 (1977) (citing *Tomlinson v. Tomlinson*, 93 Idaho 42, 47, 454 P.2d 756, 761 (1969)).

The burden of proof in modification cases has also consistently rested on the parent seeking modification. In Idaho, the burden has rested on the party seeking modification since at least 1931. *Simpson v. Simpson*, 51 Idaho 99, 102, 4 P.2d 345, 346 (1931). In *Simpson*, this Court held that the burden was on the parent seeking the modification because the moving party is the one seeking affirmative relief. *Id.* ("The rule that the party who is seeking affirmative relief has the burden of proof is one which necessarily underlies all our procedure.") (quoting *Jaycox v. Varnum*, 39 Idaho 78, 92, 226 P. 285 (1924)).

Thus, there is a long history of the burden of proof resting on the parent seeking a modification. Further, modification will not be entered unless a material, permanent, and substantial change in conditions and circumstances subsequent to entry of the original decree has been established by a preponderance of the evidence. The change in conditions and circumstances must be substantial enough to satisfy the trial court that modification would be in the best interests of the child. Although this is a straightforward standard and generally easy to apply in most cases, it becomes much more complicated when a parent is seeking modification while the other seeks to relocate—or, as in this case, has already relocated—the child, in violation of the existing custodial arrangement.

We first addressed modification of custodial arrangements in relocation cases in *Roberts v. Roberts*, 138 Idaho 401, 64 P.3d 327 (2003). In *Roberts*, both father and mother stipulated to a custody agreement which contained, among other provisions, a limitation on relocation. The mother consented to reside in either Cassia or Minidoka counties and could not move out of those counties without the prior written consent of the father. Four years after the divorce, the father petitioned to have the child support and custody arrangements modified. The mother counter-petitioned, seeking permission from the court to move to Ada County. The magistrate court did not permit the mother to relocate the children. The mother appealed to this Court.

Due to the lack of Idaho case law on this topic, on appeal the parties addressed New York and California precedent. Both California and New York had recently "reversed the traditional presumption against relocation and placed the burden on the nonmoving parent to present evidence why a move should not be permitted." Faced with this persuasive out-of-state authority, we nonetheless held: "This is contrary to Idaho Law." We went on to explain:

> In Idaho, the best interests of the children is *always* the paramount concern. Therefore, in any judicial determination regarding the custody of children, including where they reside, the best interests of the child should be the standard

12

and primary consideration. In addition, Idaho favors the active participation of both parents in raising children after divorce, which policy is reflected in I.C. § 32-717B supporting joint custody. For these reasons, in Idaho, the moving parent has the burden of proving relocation would be in the best interests of the child *before moving* in violation of a previous custody arrangement.

*Id.* at 405-06, 64 P.3d at 331-32 (emphasis added). The last sentence has been applied as a burden-shifting framework known as the *Roberts* Rule. More recently, this Court explained that the burden shifts from the parent seeking a custody modification "when two elements are met: (1) the other parent seeks permission to relocate and (2) that relocation would violate an existing custody arrangement." *Suter v. Biggers*, 157 Idaho 542, 547, 337 P.3d 1271, 1276 (2014). Thus, as we have said, "the burden [shifts] to the relocating party when relocating the children would violate the custody order." *Suter*, 157 Idaho at 547, 337 P.3d at 1276. Nothing in our case law, however, appears to cover a situation where the violation alleged is not an explicit term of the custody order.

When Bryan filed an emergency motion for temporary orders, the magistrate court initially concluded that the divorce judgment "does not require that [J.L.G.] remain living in Idaho, or in the United States." The magistrate court was correct that the terms of the decree did not *explicitly* require J.L.G. to live within the United States. However, a move that effectively frustrates the custodial arrangement has been held to be a violation in other jurisdictions. *See Egle v. Egle*, 715 F.2d 999, 1016 (5th Cir. 1983). For example, in *Egle v. Egle*, the Fifth Circuit, hearing an appeal from the former Panama Canal Zone, was also faced with the relocation of a child across significant international borders. *Id.* The Fifth Circuit applied the concept of frustration of a custodial arrangement in resolving the case. The Fifth Circuit noted that while under the traditional rule in the relevant jurisdiction, a custodial parent is entitled to change residences unless the move is detrimental to the child, "the general rule does not govern when the custodial parent's intent in changing residences is to *frustrate or destroy the other parent's visitation rights*." *Id.* (emphasis added) (citing *In re Marriage of Ciganovich*, 61 Cal. App. 3d 289, 292, 132 Cal. Rptr. 261, 263 (Ct. App. 1976)). We are persuaded by the logic of the Fifth Circuit's approach, but believe the effect of the move can be as important as the intent when a move effectively frustrates an existing visitation order. Therefore, we now hold that when a party's relocation of a child effectively frustrates an existing custodial arrangement, and the move is either opposed by or occurs without reasonable notice to the noncustodial parent, the relocating party must bear the burden of proving the move is in the child's best interests. Thus, if the non-moving parent seeks to relocate the child

and that relocation would either explicitly violate or effectively frustrate the purpose of an existing custody arrangement, the burden shifts under *Roberts*. Accordingly, in the case at bar, the *Roberts* Rule applied, and the magistrate court properly shifted the burden to Carla below.

We acknowledge that at times this Court has articulated the *Roberts* Rule as applicable when one parent seeks modification and the other "seeks permission" to relocate. However, our cases that have considered modification have almost always included dueling petitions—that is, both parents seek the trial court's leave for modification. This is consistent with the type of factual situations upon which the *Roberts* Rule was grounded and illustrates why a burden shifting framework is necessary when both parents seek affirmative relief from the court. However, *Roberts* should not be read in a way that encourages parents to ask for forgiveness rather than to seek permission, or worse yet, in a way that encourages bad faith. Unfortunately, this case contains examples of both.

As we have stated above, if a parent seeks to relocate the child and that relocation would either explicitly violate or effectively frustrate the purpose of an existing custody arrangement, the relocating parent bears the burden of proving that the relocation is in the child's best interests. To hold otherwise would be fraught with inconsistency. For example, if the custodial agreement requires Parent A to live within 100 miles of Idaho Falls, it would be illogical for the burden to rest on Parent A, absent additional facts, to prove a compliant relocation within 30 miles of Idaho Falls, was in the best interests of the child. The custodial agreement contemplated such a move. Thus, Parent B should bear the burden of proving that relocation was not in the child's best interests since Parent B was the party seeking modification.

However, when a violation concerns an implicit term of the custody order, through a move that frustrates the purpose of the custodial arrangement, the magistrate court is in a precarious position. For example, if Parent A sought the magistrate court's permission to modify a custodial arrangement to allow for a relocation, the burden would rest on Parent A—since she is the parent seeking modification. However, if Parent A preemptively relocates and then waits for Parent B to seek a modification order, Parent B would bear the burden as the moving party—and Parent A could claim, as Carla has in this case, that the move was not expressly prohibited by the custody order. Thus, the burden would be on Parent B to prove the move was not in the child's best interests. This creates a perverse incentive for parents to not seek permission from the court for a move in cases where there is not a clearly stated, explicit prohibition on relocation.

14

Further, as Carla has argued in this case, parents who have already relocated could claim the benefit of their clandestine action by asserting—after the fact—that it would be against the best interests of the child to "uproot" the child from his new environment. A relocating parent should be encouraged to seek permission to ensure the stability of the child *before* the move is sought— not encouraged to act unilaterally and then assert an after-the-fact justification. Carla urges this Court to apply *Roberts* in such a way that will encourage parents to "beg forgiveness" rather than obtaining permission. The magistrate court found that "Carla came to the conclusion on the issue of secretly and deceptively moving [J.L.G.] to a foreign country that 'it would be better to beg forgiveness' *as she stated during the trial*." (Emphasis added). Indeed, Carla's trial testimony unequivocally explains her motivation:

> I was quite certain that given notice, he would take every legal action he could to prevent me from leaving Idaho Falls and that I would not have the opportunity. It had been a very long, dark period of time for me. I had a wonderful opportunity in front of me. I had the right to take it, and I took it. I brought my son to what I felt was a better life and a better life for myself as well. *And I -- you know, it's just better to beg forgiveness. I didn't want that opportunity to be taken from me*.

(Emphasis added). Applying the *Roberts* Rule in a manner that supports such conduct cannot be in the best interests of Idaho's children.

Carla suggests that the magistrate court's initial, pre-trial findings of fact from the emergency motion for temporary orders demonstrate that she had authority to move with J.L.G. to Costa Rica. However, the denial of Bryan's initial request for a temporary order does not repaint Carla's prior actions in the hues of good faith. Carla did not rely on the magistrate court's findings of fact in deciding whether to relocate—she had already moved. Importantly, Carla's actions were not simply an oversight or a failure to act—the magistrate court found that she acted with an intent to deceive. When discussing Carla's initial declarations, offered when the magistrate court considered the temporary motion for temporary orders, the magistrate court found that "the inaccuracies, deceptive statements, and falsehoods in her declarations were carefully crafted by Carla to mislead the court as well as Bryan." We agree. Substantial and competent evidence supports these findings.

Prior to trial, the magistrate court found that Carla "certainly violated the spirit, if not the letter of the custodial arrangement." Moreover, after trial, the magistrate court found that "[o]nce Bryan moved nearer to [J.L.G.] in fall of 2019, Carla took actions to move out of the area quickly." Despite knowing for some time that she was going to relocate their son to another country, Carla

15

failed to notify Bryan of the move to Costa Rica until after this matter commenced. The first time Bryan learned of the move to Costa Rica was in a court filing in February 2020, a month after he initiated this action. Importantly, the magistrate court found that "[b]y Christmas 2019, January 2020, and February of 2020, Carla was either denying visitation altogether or making it so difficult to see [J.L.G.] that it was nearly impossible for Bryan to continue his relationship with [J.L.G.] from that point in a meaningful manner." Put another way, Carla effectively frustrated the custodial agreement giving rise to an implicit violation of the custody order and did so through subterfuge. Therefore, we conclude that the burden under *Roberts* was hers to bear.

As we held in *Roberts*, "[in] any judicial determination regarding the custody of children, including where they reside, the best interests of the child should be the standard and primary consideration." *Roberts*, 138 Idaho at 405, 64 P.3d at 331. "Idaho favors the active participation of both parents in raising children after divorce, which policy is reflected in I.C. § 32–717B supporting joint custody." *Id.* We concluded that "[f]or these reasons, in Idaho, the moving parent has the burden of proving relocation would be in the best interests of the child before moving in violation of a previous custody arrangement." *Id.* The magistrate court correctly cited this portion of *Roberts* as the law in modification cases in Idaho. Then, the magistrate court properly applied this framework to the facts of this case.

While we review questions of law de novo, "[d]ecisions as to the custody, care, and education of the child are committed to the sound discretion of the trial court and they will be upheld on appeal unless there is a clear showing of abuse of that discretion." *Johnson v. Murphy*, 167 Idaho 167, 169, 468 P.3d 297, 299 (2020) (citing *Martinez (Portillo) v. Carrasco (Mendoza)*, 162 Idaho 336, 345, 396 P.3d 1218, 1227 (2017)). Here, the magistrate court methodically reviewed what was in the best interests of J.L.G. The magistrate court found that "Bryan has met his burden of proving that a modification of the sole legal and sole physical custody provision of the Judgment are in [J.L.G.'s] best interest." The magistrate court recognized the statutory joint custody presumption from Idaho Code section 32–717B—and that it did not amount to a presumption against relocation. The magistrate court recognized that Carla's custodial rights were "*subject to* Bryan's visitation, which will at a minimum, consists of up to 4 weeks of parenting time each calendar year." (Emphasis added). The magistrate court found that "Carla's move to Costa Rica with [J.L.G.] makes the visitation provisions of the Judgment unworkable and impractical." Specifically, the magistrate court also found that "Bryan has not been able to exercise

16

all of his visitation as ordered by the Judgment." In the three months prior to the petition for modification, as previously noted, the magistrate court found Carla was either denying visitation outright or making it nearly impossible for Bryan to continue his relationship with [J.L.G.] in a meaningful manner. Taken together, by surreptitiously taking J.L.G. out of the country, Carla effectively frustrated the custodial arrangement to a degree that violated the custodial arrangement. Therefore, the burden shifting analysis set forth in *Roberts* applied here. Accordingly, we conclude that the magistrate court properly shifted the burden to Carla to prove that such a relocation was in the best interests of J.L.G.

### B. The magistrate court did not abuse its discretion in concluding that a modification was in the child's best interest.

Carla argues that the magistrate court abused its discretion in three additional ways: (1) through "*Weaver*-like error in elevating the importance of the 'fun parent's convenience' in exercising visitation;" (2) by acting "inconsistent with the core principle in *Weaver*" through "its underappreciation of the impact of the relocating to the coterminous United States would have on [J.L.G.] and Carla;" and (3) in its conclusions regarding the legal system of Costa Rica. We will address each in turn.

#### i. *The magistrate court did not abuse its discretion because* **Weaver** *is inapplicable.*

Carla places much weight on this Court's recent decision in *Weaver v. Weaver*, 170 Idaho 72, 507 P.3d 1102 (2022). Carla argues that the magistrate court committed a variety of "*Weaver*-like errors" when it elevated Bryan's convenience as the "fun parent" and penalized her for being the "responsible parent." Carla's interpretations of the magistrate court's order and this Court's decision in *Weaver* are inaccurate.

In *Weaver*, we reversed the magistrate court's order awarding a father custody from Thursdays at 6:00 p.m. to Sundays at 6:00 p.m. almost every week. Mother appealed, arguing that this custody order, which only gave her custody on two weekends and holidays that happen to fall on a weekend, did not serve the best interests of the child because "it created an unfair 'fun parent'/'responsible parent' dichotomy." *Id.* at __, 507 P.3d at 1105. We held that the magistrate court abused its discretion because "it did not adequately consider how its custody order would affect [the child's] interaction and interrelationship with her parents." *Id.* at __, 507 P.3d at 1106. We concluded that the custody "order would not further [the child's] best interests once she started kindergarten because it would dramatically reduce the amount of unstructured quality or 'free'

time she had with [mother]." *Id.* We concluded that "[i]t is in [the child's] best interests to interact with each of her parents playing each of these roles." *Id.*

Importantly, the issue with the custody arrangement in *Weaver* was that Mother only had custody during the times in which parents must be more responsible (waking the child for school, making sure homework gets done, and making sure child is in bed early because it is a "school night"). All of Father's time was weekend, summer, or holiday time, meaning Father had the child for virtually all the "fun" times. That is not the parenting plan contemplated here. Still, Carla claims that "for the same reasons that this Court found it inappropriate in *Weaver* for the magistrate court's custody decision to create a 'fun parent' versus 'responsible parent' dichotomy, this Court should find that it was simply inappropriate for the magistrate court to uproot [J.L.G.] and Carla from Costa Rica in hopes of making it cheaper, quicker, and easier for Bryan to exercise his visitation." However, the magistrate court did not "uproot" J.L.G. merely for the sake of Bryan's convenience. The magistrate court determined that Carla's unilateral decision to relocate him to Costa Rica was not in J.L.G.'s best interests. In so ruling, the magistrate court considered all the relevant factors, including those set forth in Idaho Code section 32-717.

Notably, the third factor in Idaho Code section 32-717 concerns the interaction and interrelationship of the child with his parents. I.C. § 32-717(c). The magistrate court concluded that this factor "weighs in favor of [J.L.G.] primarily living in the conterminous United States." In its analysis, the magistrate court found:

> If [J.L.G.] is required to live primarily in the conterminous United States and if Carla decides to reside in Costa Rica, then Bryan would effectively be awarded primary physical custody of [J.L.G.] Under this scenario, the court has no doubt Carla would make frequent trips to Wyoming to visit [J.L.G.] The court draws this conclusion because Carla has (1) demonstrated, at least at times, a 'smothering' or over-protective approach to parenting, (2) a very close relationship with [J.L.G.] and it is doubtful she would be able to be away from [J.L.G.] for long periods of time without having frequent and continuing contact with him, (3) taken trips to visit the people who are important in her life, (4) shown the ability (perhaps through the generosity of Paul) to travel to the United States from Costa Rica to comply with tourist visa requirements, for COVID vaccines, and for visits with loved ones.

However, "If [J.L.G.] is allowed to remain in Costa Rica, Bryan's interactions and relationship with [J.L.G.] will be significantly diminished" and "Bryan will struggle to have a meaningful relationship with [J.L.G.]." The magistrate court noted that Bryan's visitation had become harder to exercise after Carla moved J.L.G. to Costa Rica because Bryan gets a seven-day period off work, and it takes two days each way to travel between Wyoming and Costa Rica. This was supported

18

by competent evidence. Thus, *Weaver* is inapplicable here as the magistrate court did not create a fun-parent/responsible-parent dynamic in its custodial modification.

Carla also argues that "the magistrate court inadvertently weaponized Carla's superior dedication to J.L.G. to require her—the responsible parent—to upend everything in her life to retain primary physical custody of J.L.G. because the magistrate court didn't believe Bryan would do what was necessary to visit J.L.G. if he lived in Costa Rica." This mischaracterizes the magistrate court's decision. The magistrate court simply evaluated whether the relocation was in the best interests of the child. In doing so, the magistrate court properly considered the interaction and interrelationship of the child with his parents as required by Idaho Code.

*Weaver* was an unusual case and should be limited in its application; trial courts should not seek to apply it indiscriminately. Indeed, the practical realities of raising a young child suggest that there will likely be disparities in "fun" time in almost every custody arrangement. The problem in *Weaver* was the custodial arrangement deprived the mother of visitation nearly every weekend and, thus, produced an unintended yet avoidable result—namely, the parental time distribution created a "fun parent" and a "responsible parent" dynamic—because the magistrate court did not consider how the visitation schedule would impact the interaction and interrelationship of the child with his parents. Here, the custodial arrangement ordered by the court produced no such result. It cannot seriously be argued that Carla will have no "fun" time with J.L.G. merely because she is required to live in the coterminous United States in order to retain primary physical custody. As such, *Weaver* is inapplicable.

> ### ii. This Court need not decide Carla's argument concerning the move back to the United States because the magistrate court concluded that Carla had not met her burden of establishing that the initial move to Costa Rica was in J.L.G.'s best interests.

Many of Carla's more general "*Weaver* errors" are framed from the perspective of J.L.G. being required to move to the coterminous United States. For example, Carla argues the magistrate court abused discretion "when it reasoned that *Carla and J.L.G. should make an international move to anywhere in the conterminous United States* on a theory that it would make it cheaper, quick, and easier for Bryan and his parents to exercise visitation." (Emphasis added). There was a collection of "*Weaver* errors" alleged under this main heading. Importantly, however, the magistrate court found that "Carla [had] not met her burden of proving it is in [J.L.G.'s] best interests *to move to Costa Rica*." (Emphasis added). Importantly, the magistrate court weighed all

19

the relevant factors—including those relevant to the living conditions, community, and opportunities in Costa Rica. Still, the magistrate court determined Carla had not met her burden of establishing that it was in J.L.G.'s best interests to move to Costa Rica in the first place. Having determined moving to Costa Rica was not in J.L.G.'s best interests, it did not need to separately determine whether it was in J.L.G.'s best interests to stay in Costa Rica.

### iii. *The magistrate court's UCCJEA analysis was not an abuse of discretion.*

The magistrate court considered Bryan's concerns about jurisdiction vesting in Costa Rica as a factor in its best interests of the child analysis. Carla argues that this was an abuse of discretion because: (1) the magistrate court's analysis was inconsistent with the UCCJEA, Idaho Code section 32-11-105(a); (2) the magistrate court already determined it had jurisdiction, so any concern about jurisdiction would only affect future disputes and was speculative; and (3) "Bryan's disparaging opinion of the Costa Rican legal system was purely speculative."

As for the first point of error, Carla argues that the magistrate court's analysis of whether Costa Rica was a "state" for purposes of its jurisdictional analysis was improper. She points to the magistrate court's statement that "Costa Rica is not a 'state' as defined by the UCCJEA." As a general manner, such a statement appears to be inconsistent with Idaho Code section 32-11-105, which provides: "A court of this state shall treat a foreign country as if it were a state of the United States for the purpose of applying parts 1 and 2 of this chapter." More importantly, however, Carla has not appealed on the question of jurisdiction. In her brief, Carla clarified "[b]y this argument Carla is not reviving her jurisdictional motion to dismiss, but she is instead challenging the premise of both Bryan and the magistrate court's inherent skepticism of foreign jurisdiction over custody issues." Thus, Carla concedes that she is not contesting the magistrate court's decision on jurisdiction. Since the jurisdictional question of whether Costa Rica is or is not a state under Idaho's adoption of the UCCJEA is not properly before this Court, we need not independently address the alleged interpretive inconsistency advanced by Carla.

As for the second point of error, Carla alleges that since the magistrate court already determined it had jurisdiction, any jurisdictional concern is only related to a future dispute and speculative. Notably, the magistrate court concluded that "Bryan is reasonably worried that if Costa Rica were to gain jurisdiction, he would have a very hard time enforcing his parenting time with [J.L.G.]." In essence, Carla argues that since jurisdiction for this case is not at issue, such

20

concern about jurisdiction would only affect future disputes and is speculative. She claims that this diminishes the potential relevance of this non-statutory factor. While Carla mentions speculation and relevance, it appears Carla is instead challenging the best interests of the child analysis. Importantly, in the best interests of child analysis the magistrate court must "consider all relevant factors" which may include those listed in Idaho Code section 32-717(1)(a)-(g). I.C. § 32-717(1). However, "[t]his list of factors is not exhaustive or mandatory and courts are free to consider other factors that may be relevant." *Bartosz v. Jones*, 146 Idaho 449, 454, 197 P.3d 310, 315 (2008) (citing *Nelson v. Nelson*, 144 Idaho 710, 715, 170 P.3d 375, 380 (2007)). Overemphasis of a single factor is an abuse of discretion. *Schultz v. Schultz*, 145 Idaho 859, 865, 187 P.3d 1234, 1240 (2008).

Bryan argues that while the magistrate court discussed jurisdiction, it did not make its decision solely based on the jurisdictional analysis. This is supported by the magistrate court's conclusions which listed each factor considered and how each factor tipped the scales in favor of where J.L.G. should reside. Bryan claims that "[w]hether the Costa Rican legal system is adequate was not as much a consideration as the difficulty Bryan would experience in accessing it . . . ." This is supported in the record. The magistrate court reasonably found that "[b]ecause Carla initially refused to provide him with [J.L.G.'s] address, and only provided such after the court ordered her to do so, Bryan does not want to have to enforce visitation through the Costa Rican courts." Further, "Bryan is worried that if Costa Rica were to gain jurisdiction, he would have a very hard time enforcing his parenting time," which was reduced significantly after Carla moved to Costa Rica.

Importantly, it is due to Carla's own actions—moving their child to a foreign country without informing Bryan, being deceptive about her plans, and being unforthcoming about the location of the child after the move was disclosed—that gave the magistrate court cause to find Bryan's fear reasonable that Costa Rica's jurisdiction may "eventually lead to him being totally cut out of [J.L.G.'s] life." In other words, Carla's own actions in this case made the concerns about dealing with the courts of a foreign jurisdiction relevant. Importantly, the inquiry was focused on *access* to the foreign courts, not their adequacy. Carla has provided no authority to support her view that it was improper to acknowledge the potential jurisdictional problems inherent in dealing with an international custody dispute, especially where a parent has shown a propensity for disregarding existing custody arrangements and may take advantage of the laws of a foreign jurisdiction to impair the father's ties to the child. Carla's actions made the question of reasonable

21

access to a foreign court relevant to the magistrate court's best interests of the child analysis. Thus, for all these reasons, the magistrate court did not abuse its discretion as to the second point of error.

As to the third point of error, Carla contends that "Bryan's disparaging opinion of the Costa Rican legal system was purely speculative, as it was based entirely on his testimony and secondhand recitation of purported State Department sources he did not submit as evidence." However, Carla points to no such finding of fact. While she has challenged Bryan's opinion, she has not demonstrated that his opinion was ever considered or adopted by the magistrate court. In fact, it is unclear whether Bryan's unfavorable opinion played any role in the magistrate court's decision. As we have said, "[w]hen reviewing the trial court's findings of fact, the appellate court will not set aside the findings on appeal unless they are clearly erroneous such that they are not based upon substantial and competent evidence." *Nelson v. Nelson*, 144 Idaho 710, 713, 170 P.3d 375, 378 (2007). To determine if there was an abuse of discretion, Carla must point to an actual abuse. Inasmuch as Carla has not shown that the magistrate court gave any weight to this factor, we cannot say there was an abuse of discretion.

In sum, Carla does not appeal the denial of her jurisdictional motion to dismiss, so the first point of error advanced by Carla in relation to the UCCJEA analysis need not be addressed independently. As for the second, the magistrate court did not abuse discretion in considering the access Bryan would have to courts to enforce the custodial arrangement because Carla's actions made it relevant. Third, Carla challenges Bryan's opinions as speculative, but makes no argument that the magistrate court considered that opinion in its analysis, thereby rendering her own argument as merely speculative. Accordingly, we conclude in all three instances the magistrate court did not abuse its discretion.

### C. This Court will not address the due process argument raised for the first time in Carla's reply brief.

In her reply brief, Carla challenged the burden of proof on due process grounds for the first time. In her opening brief, Carla argues at length that the magistrate court applied the burden incorrectly. Later, in her reply brief, Carla raises a new argument, contending that even if the magistrate court properly applied the burden, the magistrate court still shifted the burden in a manner that violated Carla's due process rights because Carla was unaware the burden was hers to bear. This argument was not raised below or in her opening brief. As we have stated, "[a]n assignment of error is deemed waived, and will not be discussed if there is no argument contained in the appellant's brief." *Frogley v. Meridian Joint Sch. Dist. No. 2*, 155 Idaho 558, 565, 314 P.3d

613, 620 (2013) (citing *Arnold v. Splendid Bakery*, 88 Idaho 455, 466, 401 P.2d 271, 278 (1965)). The same is true when it is raised for the first time in the appellant's reply brief. As we have stated, "this Court will not consider arguments raised for the first time in the appellant's reply brief." *Thomas v. Med. Ctr. Physicians, P.A.*, 138 Idaho 200, 206, 61 P.3d 557, 563 (2002) (citing *State v. Killinger*, 126 Idaho 737, 740, 890 P.2d 323, 326 (1995)). Therefore, we do not reach the due process issues raised by Carla in her reply brief.

### D. Attorney Fees on Appeal

Bryan seeks attorney fees pursuant to Idaho Code section 12-121. The court "may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. "Reasonable attorney's fees will only be awarded to the prevailing party under I.C. § 12–121 when the court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably and without foundation." *Stewart v. Stewart*, 143 Idaho 673, 681, 152 P.3d 544, 552 (2007) (citing *Balderson v. Balderson,* 127 Idaho 48, 54, 896 P.2d 956, 962 (1995)).

We recognize that many of Carla's arguments on appeal merely ask us to second guess the magistrate court's findings. However, this case raises a unique question of law concerning the burden of proof in a discrete category of cases—the relocation of children of divorced parents when the relocation effectively frustrates an existing custody order. Therefore, we cannot conclude that Carla's argument that the magistrate court erred when it shifted the burden to her was brought or pursued frivolously, unreasonably, or without foundation. Since Carla's appeal has materially advanced the law, neither party is entitled to attorney fees on appeal under Idaho Code section 12-121.

## IV.    CONCLUSION

The decision of the magistrate court is affirmed. Bryan, as the prevailing party, is awarded costs as a matter of course. I.A.R. 40(a).

Chief Justice BEVAN, Justices BRODY, STEGNER and ZAHN **CONCUR.**

23